Edward A. Troncelliti v. Commissioner.
Troncelliti v. Commissioner
Docket No. 2928-68.
United States Tax Court
T.C. Memo 1971-72; 1971 Tax Ct. Memo LEXIS 260; 30 T.C.M. (CCH) 297; T.C.M. (RIA) 71072; April 14, 1971, Filed. Ronald F. Kidd and Stanley P. Weiner, 1617 Land Title Bldg., Philadelphia, Pa., for the petitioner. Stephen P. Cadden, for the respondent. FORRESTER *261 Memorandum Findings of Fact and Opinion FORRESTER, Judge: For the calendar year 1964, respondent determined a deficiency in petitioner's income tax of $6,332.39 and additions to that tax under sections 6653(b) and 6654 of $3,166.20 and $12.48, respectively. [1] Respondent has conceded the issue relating to the addition to tax under section 6653(b). Also, we ruled at the time of trial that petitioner had not presented sufficient evidence to support his claim for three personal exemptions for dependent children. Therefore, the only questions remaining for our decision are whether petitioner understated his taxable income for 1964 and whether respondent erred in disallowing certain deductions which petitioner had claimed for that same year. Findings of Fact Petitioner filed an individual Federal income tax return for the calendar year 1964 with the district director of internal revenue in Philadelphia, Pennsylvania. At the time of the filing of the petition herein, 298 petitioner resided in Bryn Mawr, Pennsylvania. Petitioner was born in 1915. He attended *262 Villanova University, went on to Jefferson Medical College, interned at Bryn Mawr Hospital, and began his residency in pediatrics prior to entering the armed services during World War II. He served for three years in World War II and upon his return took up a residency in pediatrics at Mary Drexel Children's Hospital. During 1964 petitioner practiced pediatric medicine in Bryn Mawr, Pennsylvania. For that year petitioner used the cash receipts and disbursements method of accounting. As a part of the normal course of his professional practice and in order to keep a record of receipts from that practice, petitioner maintained a daily log of a type customarily employed for bookkeeping purposes by medical doctors. [2] Petitioner's secretary or nurse made the entries in the daily log, and occasionally petitioner himself made entries if he saw a patient outside his employees' working hours. The entries were made at the time each patient came into the office. Thus, a patient coming to petitioner's office would go to the front desk where his name would be listed in the daily log. After having been examined, the patient would return to the front desk where he would be billed for the services *263 rendered and where an appropriate entry would be made in the daily log. The daily log provided spaces for entries showing the patient's name, the type of service rendered, and whether the service was charged to the patient's account or paid (by cash or check) at the time of the visit. The daily log also provided space for the entry of amounts that petitioner received for services previously charged. Petitioner transferred the sums of the daily entries from the daily log to monthly summary sheets in order to arrive at the monthly totals of the daily entries. The monthly summary sheets contained five columns which reflected the monthly totals of (1) charge business, (2) cash business, [3] (3) amounts received on accounts receivable, (4) total business *264 (the sum of charge and cash business), and (5) total cash received (the sum of cash business and amounts received on accounts receivable). At the end of the year the monthly summaries were totaled so that petitioner could determine his yearly receipts. For 1964 the monthly and yearly totals of each of these five columns were shown, and should have been shown, as follows: [4]
Rec'd. on
Total
Total Cash
Month
Charge
Cash
Accounts
Business
Received
January
$ 2,689.00
$ 215.00
$ 2,369.00
$ 2,904.00
$ 2,584.00
February
2,214.00
239.00
2,202.50
2,453.00
2,441.50
March
2,396.00
182.00
2,580.00
2,578.00
2,762.00
April
1,657.00 293.00
2,289.00
1,950.00
2,582.00
May
1,963.00
273.00
1,761.00
2,236.00
2,034.00
June
2,425.00
347.00
1,976. 00
2,772.00
2,323.00
July
1,717.00
340.00
1,963.00
2,057.00
2,303.00
August
2,263.00
238.00
1,912.00
2,501.00 2,150.00
September
2,505.00
197.00
2,138.00
2,702.00
2,335.00
October
1,848.00
264.00
2,338.00
2,112.00
2,602.00
November
2,352.00
209.00
2,395.00
2,561.00
2,604.00
December 2,098.00
235.00
2,117.00
2,333.00
2,352.00
Correct Totals
$26,127.00
$3,032.00
$26,040.50
$29,159.00
$29,072.50
Totals as Shownon Petitioners'
Summaries
$25,887.00
$2,885.00
$26,108.00
$28,772.00
$29,100.00
*265 299 Petitioner rarely made house calls. However, he maintained a daily appointment book which reflected payments *266 which he received for certain services performed outside his office. Examples of such services were services rendered within a hospital. The appointment book showed a sum of $6,710, but because of 13 errors in carrying over running totals from day to day the true sum should have been $6,992.17. In preparing his 1964 Federal income tax return, petitioner gathered the information in the daily log and the appointment book in order to compute his total income. During 1964 petitioner also received rental income of over $100 per month from an apartment that he maintained above his office. Petitioner had three checking accounts from which he made payments for business expenses. Two of the accounts were designated as business accounts while the third was a joint checking account he maintained with Evelyn Troncelliti, whom we assume was his wife. Despite the designation of two of the accounts as business accounts petitioner drew checks for personal expenses on at least one of the two business accounts. As proof of payment of various deductible expenses, petitioner introduced into evidence 386 checks [5] drawn on these three accounts during 1964. [6] The checks represented a total of $26,952.69 *267 and 25 of these checks (representing $4,704) were drawn to cash. In calculating his deductions for 1964 petitioner tabulated various cash and moneyorder payments which he had made, sifted through the information in his various checkbooks, and perpared a set of six worksheets which listed 277 items of expense. Each item on the worksheets showed the date of payment, the payee, the amount of payment, and the general purpose of payment. The sum of the items on the worksheet as well as the sums per category of expense may be summarized as follows: [7]
Sum of Items
As Shown on
True Sum
Worksheets
of Items [8]
Salary
$ 4,658.48
$ 4,645.48
Drugs
805.80
805.80
Laundry
1,171.29
1,216.29
Cleaning
160.00
160.00
Rental Car
2,556.55
2,556.56
Car Expense
242.89
272.39
Stationery & Sub- scriptions
138.26
138.26
Insurance
524.70
524.70
Taxes
146.34
146.34
Interest
229.99
229.99
Utilities
2,434.19
2,434.27
Books
25.00
25.00
Dues & Licenses
253.50
253.50
Oil & Fuel
122.66
122.66
Repairs & Painting
197.20
197.20
Bank Charges
7.70
7.70
Entertainment
1,020.79
1,020.79
Property Taxes
Mortgages
1,946.15
1,946.15
Office Supplies
300.71
300.71
Contributions
Travel Expenses for Meeting
258.86
258.86
Fixtures & Equip- ment
Miscellaneous
1,921.45
1,921.45
Gifts 25.00
25.00
Totals
$19,147.51
$19,209.10
*268 Of the 277 items listed on the worksheets, 237 items (representing $12,376.23) *269 corresponded to individual canceled checks in evidence. Of the items corresponding to checks in evidence, 5 (representing $639.10) corresponded to checks drawn to cash. The worksheets indicated that 17 items (representing $3,045.70) were paid in cash, but petitioner introduced no receipts of any sort evidencing these payments. The worksheets also indicated that 10 items (representing $1,868.29) were paid by money order, but petitioner introduced no receipts of any sort evidencing these payments. The worksheets further indicated that a check which was not in evidence and which underlay one of the items on the 300 worksheets was never sent. [9] The worksheets on their face indicated that 6 items (representing $981.76) could not be traced to canceled checks. There were an additional 6 items (representing $937.12) which could not be attributed to either cash or moneyorder transactions and for which there were no underlying checks in evidence. For many items out of the group of 237 items corresponding to individual canceled checks, the amount listed on the worksheets differed from the amount written *270 on the face of the corresponding check. Thus, the total (as calculated from the worksheets) of the 237 items corresponding to canceled checks came to $12,376.23, but the total as calculated from the faces of the corresponding 237 checks came to only $12,039.40. Many of the discrepancies explained themselves. For instance, in the case of items of salary the amount on the worksheets would be the employee's full salary while the corresponding amount on the face of the checks would be the employee's post-deduction take-home pay. Nevertheless, some of the discrepancies were caused by errors in transferring figures and by reasons not explained to us. On his income tax return, petitioner reported a total of $35,705 as gross receipts. He subtracted $36 as returns and allowances and $2,292.01 as cost of materials and supplies to arrive at a gross profit of $33,376.99. Finally, he subtracted $21,197.10 as other business deductions in order to arrive at a net profit from his profession of $12,179.89. The other business deductions claimed were as follows: Depreciation
$ 1,574.93
Taxes on business and business prop- erty
374.49
Rent on business property
2,556.55
Repairs
244.45
Salaries and wages
4,658.48
Insurance
524.70
Legal and professional fees
450.00
Amortization
946.15
Interest on business indebtedness
229.99
Utilities
2,799.24
Laundry and uniforms
1,191.29
Office cleaning
470.00
Bank charges
30.00
Professional dues and licenses
253.50
Car expenses
935.05
Entertainment
1,146.14
Stationery, stamps, etc.
390.78
Contributions
64.00
Research laboratory
200.00
Travel and meetings
235.91
Miscellaneous 1,921.45
TOTAL
$21,197.10
*271 Using the source-and-application-of-funds method of reconstructing income respondent estimated petitioner's application of funds as follows: New typewriter (per return)
$ 365.76
Reduction in mortgage (estimated at $60 per month)
720.00
Undetermined purchases based on $480 claimed on return as state sales tax (computed at sales tax rate of 5 percent)
9,600.00
Food (not subject to state sales tax) for 5 persons at $10 per person per week
2,600.00
Clothing (not subject to state sales tax) for 5 persons
700.00
Gasoline for auto (second car,
200.00
1963 income tax paid in 1964
497.36
Contributions per return
578.00
Interest per return
1,124.00
Taxes per return
1,525.99
n10 Alimony (per court records) [10] 4,275.00
TOTAL
$22,186.11
From this total application of funds, respondent *272 subtracted (as reported sources of funds) depreciation expense per return of $1,574.93 and adjusted gross income (i.e., net profit from profession) per return of $12,179.89 to arrive at a total understatement of adjusted gross income of $8,431.29. Respondent estimated that $1,620 of this understatement was attributable to rental income of $135 per month for 12 months from the rental of the apartment above petitioner's office. Therefore, respondent concluded that petitioner had understated his gross receipts from his medical practice by $6,811.29. In addition, respondent disallowed the following claimed deductions as not having been substantiated as ordinary and necessary business expenses: Rent on business property
$2,556.55
Amortization
946.15
Professional dues and licenses
200.00
Car expenses
935.05
Entertainment
1,146.14
Research laboratory
200.00
Travel and meetings
235.91
Miscellaneous 1,921.45
Total
$8,141.25
Thus, respondent increased petitioner's net profit from his profession by $14,952.54, 301 the sum of the alleged understated gross receipts and the disallowed deductions. Respondent determined that petitioner was not entitled to *273 three dependency exemptions which he claimed on his return. The sum total of the evidence in the record is petitioner's unsupported testimony that the exemptions were claimed because he had contributed the entire support for his daughter and two other unrelated children who were "living in my household at the time." We ruled from the bench that petitioner had failed to carry his burden of proof as to these claimed exemptions. Opinion Using the source-and-application-of-funds method of reconstructing income respondent determined that petitioner had understated his taxable income for 1964. This method is based on the assumption that the amount by which a taxpayer's application of funds during a taxable period exceeds his reported sources of funds for that same period has, absent some explanation by the taxpayer, taxable origins. As explanation the taxpayer may show that the difference between the total application funds and the total reported sources of funds is attributable to such nontaxable items as loans, gifts, inheritanc es, or assets on hand at the beginning of the taxable period. *274 The method has been equated with the cash-expenditures method [11] and may also go under such names as the sources-and-expenditures method, Eugene Vassallo, 23 T.C. 656, 661 (1955), the excess-cash-expenditures method, Max Cohen, 9 T.C. 1156, 1163 (1947), affd. 176 F. 2d 394 (C.A. 10, 1949), or, simply, the expenditure test, United States v. Caserta, 199 F. 2d 905, 906 (C.A. 3, 1952).
*275 It is essentially an outgrowth of the net worth method and differs from it in that it is effective "against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before" while the usual net worth method succeeds only where the taxpayer applies his unreported income toward investments or otherwise visible durable property. Taglianetti v. United States, 398 F. 2d 558, 562 (C.A. 1, 1968), affd. 394 U.S. 316 (1969). It is not a method of accounting, Eugene Vassallo, supra at 661, but is available to the Commissioner as a test of a taxpayer's books and records and as evidence of unreported income, Hoffman v. Commissioner, 298 F. 2d 784, 786 (C.A. 3, 1962), affirming on this issue a Memorandum Opinion of this Court, especially where no books or records exist, Joseph F. Giddio, 54 T.C. 1530, 1533 (1970), or where the books and records fail to reflect all of the taxpayer's income. E.g., Holland v. United States, 348 U.S. 121, 132 (1954). Respondent derived his determination of petitioner's application of funds in large part from entries in petitioner's *276 return itself. Thus, on his return petitioner had itemized deductions for contributions of $578, interest of $1,124, taxes of $1,525.99, and alimony of $4,024. [12] Petitioner also claimed as an itemized deduction $480 for state sales tax which, at a tax rate of 5 percent, corresponded to undetermined purchases of $9,600. See Pa. Stat. Ann. tit. 72, sec. 3403-201 (Purdon Supp. 1970) (reflecting 1968 Amendment which raised rate to 6 percent). In addition the return indicated that petitioner had bought at a cost of $365.76 a typewriter for use in his profession. The sum of these items alone was $17,468.75. If this sum is added to the sum of $21,004.03 [13] claimed on the return to have been applied for returns and allowances, 302 cost of materials and supplies, and other business deductions, [14] it is immediately apparent that the return itself shows that petitioner applied $38,472.78 while he reported as gross receipts only $35,705. *277 Respondent further determined that during 1964 petitioner had applied funds to pay income taxes of $497.36, to reduce a mortgage by $720, to buy $200 worth of gasoline for a second car, and to purchase $3,300 worth of food and clothing for five persons. [15] None of these last three amounts (which are obviously based on estimates) seem unreasonable, arbitrary, or excessive; in the absence of evidence to the contrary, we accept them as approximations of petitioner's personal expenses for 1964. Therefore, by adding these additional items to the total application of $38,472.78 derived from the return, it appears that petitioner applied funds of $7,485.14 in excess of gross receipts from his profession. [16]
*278 From what sources did petitioner derive this excess of $7,485.14? He received income of over $100 per month from the rental of an apartment that he maintained above his office. Although he testified that he believed his secretary or nurse recorded the receipt of this rental income in the daily log, we were unable to find any entries in the daily log or the appointment book which corresponded to such rental receipts. Petitioner claimed that he lived in the apartment for part of 1964 but his unsubstantiated testimony was couched in such general terms that we cannot be sure whether, or for how long, he was there. In fact, although his testimony seemed to imply that he was living above his office for the second half of 1964, writings on a check dated October 10, 1964, tend to show that he was living elsewhere than above his office on that date. In the absence of persuasive evidence to the contrary, respondent's determination that petitioner failed to include $135 of rental income per month for 12 months (or $1,620) seems reasonable and must stand. As petitioner revealed no other sources of income at trial, we are compelled to agree with respondent's determination that the remaining *279 unexplained income came from petitioner's professional practice. At trial petitioner failed to respond to the Commissioner's use of the source-and-application-of-funds method upon which the deficiency was primarily determined. Instead he attempted to show how he had arrived at the various entries on his return. To that end he relied upon books and records which he claimed revealed not only all of his income sources but supported as well the expenses he had deducted for the year 1964. Preliminarily, petitioner argues that where the difference between the amount of income according to his records and the amount of income according to respondent's determination is not substantial, respondent's resort to the source-and-application-of-funds method "without so much as a cursory examination of Petitioner's books and records by the Respondent is improper and unwarranted and should be held to be an arbitrary and unreasonable course of action by the Respondent." Whatever the validity of petitioner's proposition, it does not apply to the present situation because the discrepancy here is not insubstantial. Furthermore, there is a strong intimation that petitioner withheld his books and records, *280 making himself the cause of respondent's resort to the source-and-application-of-funds method. In any event, even where a taxpayer presents records which are consistent on their face, we are not bound to accept 303 them if we find that they fail to reflect adequately the taxpayer's total income for the taxable year in question. E.g., Holland v. United States, supra; John Harper, 54 T.C. 1121, 1129 (1970); see sec. 446(b). After comparing the books and records with the other evidence before us, we feel that their inadequacy as a measure of petitioner's income would have been ample justification for respondent to employ the source-and-application-of-funds method even if the books and records had been available to respondent at the time of his determination of petitioner's tax liability. It is true that we admitted the daily log as a record which petitioner maintained in the regular course of his profession and which it was in the regular course of his profession to maintain. See 28 U.S.C. sec. 1732 (1964); cf. secs. 7441, 7453; Fed. R. *281 Civ. p. 43(a). However, as a measure of his income in 1964, it was of doubtful inclusiveness and of minimal probative value when viewed in light of such factors as its incompleteness, petitioner's maintenance of a subsidiary (and rather sketchy) cash receipts journal in the form of an appointment book, petitioner's failure to report certain rental income, and the excess of expenditures over receipts as indicated by petitioner's own return. Petitioner's expense records which consisted of worksheets and canceled checks were similarly inadequate. The worksheets reflected many, but not all, of the canceled checks in evidence; conversely, the canceled checks reflected many, but not all, of the entries on the worksheets. As there were no underlying bills, invoices, or other vouchers for any of the canceled checks, each of the checks failed to reflect the particular purpose for which it was drawn, and except for categorization under general headings of expense, the worksheets failed to provide significant ancillary explanation. Some tenuous inferences about the purpose of payment may have been drawn from the name of the designated payee on each check, [17] but the fact that a particular *282 check was drawn for a particular purpose in no way required the conclusion that such a purpose gave rise to a deductible expense. We believe respondent was sufficiently generous in allowing $13,055.85 as professional expenses deductible from gross profit. As further evidence of the inadequacy of petitioner's books and records, we should note that we discovered numerous errors of addition and of figure transposition on the face of both the income and expense records, even though a certified public accountant testified that he had tested out the "mathematics" of records and believed that petitioner's return properly reflected his books and records. In summary, these were not books and records upon which we could place blind, or even much, reliance. The only exhibits presented as evidence before us were the daily log, the appointment book, various summary sheets, petitioner's expense worksheets, a number of canceled checks, and petitioner's return for the year in issue. In addition petitioner and a certified public accountant retained for the purpose of verifying petitioner's *283 accounts testified as to petitioner's income and expenses for 1964. Neither of these two witnesses made more than a passing reference to the pretrial interactions between petitioner and respondent. Nevertheless, during and after trial counsel for both sides referred to constitutional issues stemming from pretrial events. Indeed, petitioner devoted most of his reply brief to issues pertaining to petitioner's constitutional rights during respondent's pretrial examination and investigation. [18] While petitioner may have had some constitutional basis to support a redetermination of the deficiency herein, the record before us offers no sound factual support for the constitutional arguments propounded. *284 On the basis of the entire record, we find that petitioner has failed to meet the burden of proving that he did not understate his income for 1964. Similarly, we find that he has failed to substantiate the deductions which respondent disallowed. Also, as 304 petitioner has presented no evidence on the issue of the addition to tax under section 6654, respondent must prevail thereon. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. The daily log contained instructions for use, but an examination of the daily log indicates that petitioner failed to follow many of those instructions. For example, the instructions in the daily log anticipated the collateral use of an accounts receivable ledger on which transactions with individual patients or families could be accumulated. If such an accounts receivable ledger existed, it was not introduced into evidence.↩
3. Cash business included amounts paid by check. ↩
4. While petitioner introduced the monthly summary sheets as well as the daily log into evidence, because of the many obvious summation errors on both the daily log and the monthly summary sheets and because of various errors in transferring figures from the daily log to the monthly summary sheets, we have independently summed each of the individual entries in the daily log to arrive at the correct monthly and yearly totals. We discovered 33 summation errors in the daily sums of entries in the daily log and 5 errors in transferring figures from the daily log to the monthly summary sheets.↩
5. Petitioner maintained business files for his bills and invoices, but he failed to present any bills, vouchers or other underlying exhibits to support either the canceled checks or any of his claimed business expenses. ↩
6. Petitioner also introduced 25 checks which were drawn during 1963. While some of these checks were not paid by the drawees until 1964, we have considered none of them as having been paid in 1964. See Estelle Broussard, 16 T.C. 23 (1951); Estate of Modie J. Spiegel, 12 T.C. 524↩ (1949). 7. In addition to these totals the worksheets showed penciled sums (taken from another schedule which was not in evidence) which were not supported or substantiated by any of the other evidence. These additional sums were as follows: ↩
Drugs
$1,486.21
Laundry
20.00
Cleaning
310.00
Car Expenses
692.16
Stationery & Subscriptions
352.52
Taxes
226.15
Utilities
365.05
Repairs & Painting
52.25
Entertainment
125.39
Travel Expenses for Meeting
27.05
Gifts 11.75
Total
$3,668.53
8. We discovered five summation errors on the worksheets.↩
9. Quite properly the amount of this check was not included on the worksheets.↩
10. Although petitioner apparently claimed only $4,024 as an alimony deduction on his return, in the notice of deficiency respondent allowed $4,275 as an alimony deduction on the ground that court records showed that the larger deduction of $4,275 should have been claimed and allowed. Respondent used the larger figure in computing petitioner's application of funds.↩
11. Hugh B. Buckner, T.C. Memo. 1964-147. Strictly speaking the source-and-application-of-funds method as used in this case differs from the classical cash-expenditures method as the latter method developed from the net-worth method. The first step in the cashexpenditures method is a valuation of the taxpayer's assets at the beginning of the taxable period in order to determine the taxpayer's funds available for expenditure during the ensuing taxable period; the second step is a determination of the amount by which expenditures exceed reported income for the taxable period. Goldberg v. Commissioner, 239 F. 2d 316, 318 (C.A. 5, 1956), affirming on this issue a Memorandum Opinion of this Court. In employing the source-and-application-of-funds method here, respondent did not actually compute petitioner's net worth but assumed that it was the same at both the beginning and end of 1964. Although the burden was on petitioner to show the inaccuracy of that assumption as embodied in respondent's presumptively correct determination, he has not directed our attention to any "cache of cash," Holland v. United States, 348 U.S. 121, 134↩ (1954), or other nontaxable source which may have been at his disposal and of which he availed during the taxable year.
12. Respondent determined that the alimony deduction and, therefore, the application of funds for alimony, should have been $4,275. See footnote 10, supra. ↩
13. This sum does not include $1,574.93 reported as depreciation expense or $946.15 reported as amortization expense. Although these items, if substantiated, would be deductible from gross profit, they do not represent actual expenditures or applications of funds. ↩
14. Note that neither the cost of the typewriter nor any amount applied for the other items accounted for in the $17,468.75 subtotal is duplicated under these headings.↩
15. Food and clothing were not subject to the state sales tax. Pa. Stat. Ann. tit. 72, sec. 3403-203(q), (u)↩ (Purdon 1964). The five persons included petitioner, three children claimed as dependents, and an additional person not claimed as a dependent. It was not inconsistent for respondent to disallow petitioner's claimed dependency exemptions for the children while at the same time determining applied funds for their food and clothing because, inter alia, petitioner may have paid for the food and clothing but still may not have furnished more than half of entire support. Petitioner failed to show that this specific determination was in any way erroneous. 16. This sum differs by $946.15 of amortization expense from the sum of $8,431.29 determined by respondent. Respondent allowed that the depreciation expense of $1,574.93 represented a "source" of funds, but he denied similar treatment to the amortization expense of $946.15. Although the distinction may be a semantic one, it may be better to consider the depreciation and amortization expenses not as "sources" of funds but as "nonapplications" of funds. It is true that no evidence was introduced to support the amortization expense, but that circumstance has been accounted for by respondent's disallowance of the deduction for amortization expense. See also footnote 13, supra.↩
17. Of course, not even these inferences could be drawn with respect to the numerous checks drawn to cash.↩
18. Petitioner argued that he had refused to give respondent access to his records unless he was assured that respondent would not use any information obtained from those records in a criminal prosecution against him and that respondent should have accepted this condition because it was based on a constitutional right. He contended that his refusal to grant to respondent access to those records "should not be used to his detriment when he had a constitutional right to decline to give such access." Cf. United States v. Vadner, 119 F. Supp. 330 (E.D.Pa. 1954); In re Friedman, 104 F. Supp. 419↩ (S.D. N. Y. 1952). He finally concluded that the Commissioner's determination based on an estimate of his income and expenses rather than on an examination of his records was so unjustified, unreasonable, and arbitrary that we should have denied it the presumptive correctness which normally would attach to it.