LEONARD and EVELYN PARKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Parker v. Commissioner
Docket No. 6452-73.
United States Tax Court
T.C. Memo 1976-225; 1976 Tax Ct. Memo LEXIS 177; 35 T.C.M. (CCH) 986; T.C.M. (RIA) 760225; July 20, 1976, Filed Solomon Fisher and Peter J. Picotte, II, for the petitioners. Alan E. Cobb, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income tax: Section 6653(a) [1] Tax Year
Deficiency
Addition to Tax
1967
$20,424.20
$1,021.21
1968
6,748.95
337.45
1969
3,473.33
173.67
The issues presented for decision are: (1) Whether petitioners had unreported income in each of the years in issue; (2) Whether petitioner, Leonard Parker, obtained credit in the form of playing chips *178 and cash at various gambling casinos by fraud and with no intention to repay such credit, and whether such funds less repayments constitute taxable income to petitioners in the years in issue; (3) Whether results of a polygraph examination of petitioner, Leonard Parker, are admissible into evidence; (4) Whether any part of any underpayment of taxes was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a); (5) If the Court holds that petitioners omitted income, whether petitioners are entitled to use income averaging; and (6) Whether petitioner, Evelyn Parker, is an innocent spouse within the meaning of section 6013(e). Issues (3), (4), (5), and (6) become moot if we hold for petitioners on issues (1) and (2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioners filed their petition, they resided in Philadelphia, Pennsylvania. Petitioners filed joint returns for 1967, 1968 and 1969, using the cash receipts and disbursements method of accounting. Petitioner Evelyn Parker is a party only by virtue of having filed a joint income tax return with her husband, and petitioner *179 Leonard Parker will be referred to herein as "petitioner." Petitioner was born in 1929 and left school after completing the tenth grade. After leaving school he worked at various jobs until 1946 when he enlisted in the Army and served for approximately two years. Upon his discharge from the service in late 1947, he worked in Macon, Georgia as a candid photographer and Miami, Florida as a car attendant. Subsequently he returned to Philadelphia and enrolled in the Line-O-Type Institute of Philadelphia under the GI Bill of Rights program. Failing to find employment in the Line-O-Type field, he went to work selling shoes in various retail shoe stores. In 1950 he married Evelyn, and took a position with Abbott's Dairy as a milk truck driver. He later became a brakeman for Reading Railroad, but he sustained an injury and was forced to leave that position. He then took a position driving a taxicab for the Yellow Cab Company in Philadelphia. He eventually returned to selling shoes and in approximately 1962 he became an independent contractor selling shoes, on a commission basis, for Barclay Shoe Company. He worked continually for Barclay Shoe Company from 1962 to late 1969, when *180 the company went out of business. After Barclay discontinued operations, petitioner was employed by the Stern Shoe Company of Philadelphia as a salaried shoe salesman. As a commissioned salesman for Barclay Shoe Company, petitioner had approximately 150 accounts in a geographic area which covered the states of Pennsylvania, southern New Jersey, Delaware, Maryland, parts of Virginia and West Virginia, and the District of Columbia. Petitioner worked full time during the years 1967 through 1969 for Barclay Shoe Company and devoted at least 40 hours per week to contacting his various accounts.In addition, he attended at least 12 shoe shows per year in an attempt to increase his sales. Since the shoe shows took place on weekends, he occasionally had his wife accompany him. At the end of each month, petitioner received a statement from the Barclay Shoe Company indicating the sales transacted during the month and the commissions earned thereon, together with a check in the amount of the commissions. At the end of each year, the company issued petitioner a Form 1099 showing the total commissions paid by the company to him during the year. In each of the years in issue, petitioner *181 reported the income shown on the Form 1099 on his tax return. Similarly, he received a wage and tax statement, Form W-2, from the Stern Shoe Company for the period in 1969 during which he was employed by that company, and he reported that income on his tax return for 1969. During the years 1967, 1968 and 1969 petitioner engaged in no trade or business other than the shoe business. Other than interest and dividends reported on his income tax returns for the years in issue and the small amount of wages reported in the 1967 return, petitioners did not have any income other than that earned from the shoe business. Petitioner reported gross income from all sources during the years in issue as follows: 1967
1968
1969
Salaries and Wages
$ 443.62
$ 3,900.00
Dividends and Interest
560.05
$ 654.94
761.40
Schedule C (Gross)
5,982.84
9,074.18
6,975.00
$6,986.51
$9,729.12
$11,636.40
During each of the years 1967, 1968 and 1969, petitioners were insolvent. At the time of trial their liabilities exceeded their assets by about $20,000. During each of the years at issue petitioners supplied over half the total cost of supporting their family. *182 They expended a modest amount on their family's personal living expenses. Each week petitioner gave his wife about $30 to purchase food and other necessities. Additional assistance came from Evelyn's parents who gave her spending money and food. The Parker family frequently ate at Evelyn's parents' house, sometimes as often as three times a week. Petitioners maintained a modest lifestyle. They did not entertain at home or go out for amusement and, except for occasions when Evelyn's parents took her and the children to Atlantic City, they did not travel for pleasure or go on vacations other than trips to gambling casinos described hereinafter. Evelyn's clothes and those of her children were made by her father who was a tailor. Petitioner did not provide his wife any luxuries, such as furs and jewelry, during this period. Petitioner has gambled all his life. He played the horses, bet on ball games, and played cards. He used to play poker every Saturday night with friends. One night the police raided the poker game and arrested all the players. One of the poker players was a known bookmaker named Larry Geller who had with him wagering information from his day's business. *183 Geller denied the information belonged to him. After the players, including petitioner, were discharged from jail the next day, Geller asked petitioner if he could use petitioner's telephone temporarily. Geller was afraid to use his own because the police knew he was a bookmaker. Petitioner agreed to let Geller use the telephone in his basement for a week in return for $50 (which Geller never paid him).One night while petitioner was having dinner with his family in the kitchen and Geller was using the basement telephone, the police came and arrested both petitioner and Geller. On May 10, 1966, petitioner was convicted of being a proprietor of a gambling house, pool selling, bookmaking and conspiracy, and fined $100. During the years 1967 through 1969, various gambling casinos in Las Vegas, Nevada, and elsewhere offered free transportation, lodging and meals to persons interested in gambling. In early 1967, petitioner was invited to participate in such a gambling junket to Caeser's Palace in Las Vegas. He looked upon the junket as a vacation which he and his wife could not otherwise afford. Every customer who participated in a gambling junket was given a specific line of *184 credit by the casino sponsoring the junket which he could draw against by executing markers. Generally, a casino customer deciding to obtain credit from a casino merely filed a credit application listing his name, residence address, firm name and address, and his bank. No other information was required, and the customer was not asked to represent the manner in which he would use the credit extended to him or the extent to which he would gamble. If the application were approved, the customer could obtain credit in the form of playing chips either at the gaming table or at the cashier's cage. When credit was obtained, the customer was required to sign a marker which was, in essence, a blank check enabling the casino to draw against the customer's bank account in the event the customer did not pay his debts to the casino. Prior to petitioner's first junket, friends told him that if he played heavily and appeared to lose, Caesar's Palace would invite him back, provided he paid his debts. Petitioner was also told of several ways in which he could convert the casino's credit into the cash needed to repay the casino, while, at the same time, appearing to lose money. Petitioner's first *185 gambling junket was to Caeser's Palace in Las Vegas on or about May 14, 1967. During the years 1967, 1968 and 1969, petitioner returned to Las Vegas and traveled to other places on gambling junkets approximately 15 to 20 times. On most of these trips his wife accompanied him.Eveyln did not gamble. She amused herself during the trips by window shopping, going to see the various night club shows and watching the gambling. During the day she enjoyed the sun by the pool. She considered the trips to Las Vegas to be vacations. On each junket petitioner followed the procedures outlined by his friends. He applied for credit, had it approved, and then played at the various gaming tables of the casino issuing him credit. Petitioner generally broke even or suffered small losses from his gambling activities. From time to time, either he or his wife would go to the cashier's cage to cash in small amounts of chips, ranging from $100 to $300. He restricted himself to converting small amounts to avoid inquiry into his credit status with the casino. During the years in issue the casinos in Las Vegas honored each other's chips. Additionally, a casino did not require its credit customer to *186 gamble on such credit only on its premises. These policies enabled petitioner to travel from the casino issuing him credit to a second casino and convert the chips from the first casino into the chips of the second casino. Furthermore, when petitioner presented these converted chips for cash, the second casino would not check on his credit standing with the first casino. Thus petitioner could convert far more chips during a single visit to a cashier's cage at other casinos than at the credit-issuing casino without causing inquiry into his credit status. By the time a trip was over, petitioner had accumulated cash generally equal to the amount of credit that had been extended to him. He brought the money back to Philadelphia in a money belt. He kept the money in his house or in his safety deposit box until about a week or ten days later, when he purchased a cashier's check or money order in the amount of his debt to the casino and mailed it to the casino. This repayment completed the cycle of borrowing and achieved petitioner's goal of obtaining a free vacation. In addition to the trips to Las Vegas, petitioners also went on junkets to Puerto Rico and England during the years *187 in issue. During the years in issue, petitioner received credit from the following casinos on the dates and in the amounts indicated: 1967 Casino
Date
Amount
(1) Caesar's Palace
May 14
$ 2,000
July 11
6,000
July 13
2,000
August 11
1,500
August 12
8,000
August 25
1,000
August 26
3,000
August 27
3,500
September 12
1,500
September 13
1,500
September 14
1,000
September 15
4,000
October 5
3,000
October 6
19,000
$57,000
(2) Flamingo Hilton
August 15
$ 4,000
August 24
1,000
August 25
1,000
August 26
1,500
August 27
5,000
September 18
8,000
October 9
10,875
$31,375
(3) Dunes Hotel and
July 11
$ 2,000
Country Club
September 14
2,000
$ 4,000
Total
$92,375
1968
(1) Sahara Hotel
June 21
$ 500
(2) Circus-Circus
No date
$ 4,000
Hotel
indicated
(3) Aladdin Hotel and
No date
$ 2,000
Casino
indicated
(4) Frontier Hotel
No date
$10,250
indicated
(5) El Conquistador
No date
$ 6,000
Hotel and Casino,
indicated
Puerto Rico
(6) Victoria Sporting
No date
$ 5,000
Club, London
indicated
Total
$27,750
During the years 1967, *188 1968 and 1969, petitioner made the following repayments to the aforementioned casinos: CAESAR'S PALACE Date
Amount
1967
May 22
$ 2,000
July 21
2,000
August 11
6,000
August 24
9,200
August 27
300
September 9
2,500
September 12
5,000
September 13
3,000
September 14
5,000
November 14
1,000
$ 36,000
1968
February 3
500
March 16
500
May 9
1,500
June 19
500
October 24
1,000
November 29
1,000
$ 5,000
Total
$41,000
FLAMINGO HILTON
1967
August 28
$ 4,000
September 13
8,500
September 23
3,000
October 4
5,000
November 20
1,000
$21,500
1968
February 1
$ 500
March 20
500
May 7
500
June 20
500
$ 2,000
1972
December
$ 200
$ 200
Total
$23,700
DUNES HOTEL AND COUNTRY CLUB
1967
August 21
$ 2,000
September 28
2,000
Total
$ 4,000
SAHARA HOTEL
1969
January 16
$ 500
ALADDIN HOTEL AND CASINO
1968
$ 200
As of December 31, 1969, petitioner had outstanding balances due to the following casinos: Casino
Balance due
Caesar's Palace
$16,000
Flamingo Hilton
7,875
Circus Circus Casino
4,000
Aladdin Hotel and Casino
1,800
Frontier Hotel
10,250
El Conquistador Hotel & Cas.
6,000
Victoria Sporting Club
5,000
Total
$50,925
*189 Petitioner intended to repay all of the money he borrowed from the various casinos. As time progressed, however, he realized that his credit transactions with the various casinos amounted to interest-free loans, and he began to lengthen the period of time between his borrowings and his repayments. Eventually he began to use portions of the casino funds to pay other personal obligations. As a result, by late 1968 he was unable to currently repay the money he had borrowed from the casinos. Petitioner is presently a partner in a travel agency which arranges gambling junkets to casinos throughout the world. His outstanding obligations to Las Vegas casinos prevent him from holding a work card there, which is a prerequisite to conducting Las Vegas junkets.One of the reasons for his continued intention to repay his outstanding debts to the casinos is his desire to be able to work in Las Vegas. The special agent and the revenue agent who investigated and examined the returns of petitioners for the years 1967, 1968 and 1969 determined that the petitioners' books and records adequately supported the income and deductions claimed by them on their returns for those years. After a thorough *190 investigation they could find no evidence that petitioner was engaged in any trade or business other than that of a full-time commissioned shoe salesman, or that he was engaged in any gambling activities other than his trips to legal gambling casinos. Respondent's statutory notice of deficiency recomputes petitioners' taxable income on the basis of the application and source of funds method. In computing petitioners' source of funds, no credit was given for monies borrowed from various gambling casinos in Las Vegas. If the money obtained by petitioner on credit in the form of playing chips at the various casinos were converted to cash, petitioners' source of cash available would exceed their expenditures for each of the years in issue. OPINION Respondent determined that petitioners failed to report income in the calendar years 1967, 1968 and 1969 in the respective amounts of $57,983.97, $27,178.50 and $15,832.86. This determination was made by using the source and application of funds method of reconstructing income, an indirect method of proving unreported income. The method is based on the assumption that the amount by which a taxpayer's expenditure of funds exceeds his *191 reported source of funds during a given taxable period constitutes taxable income, absent a reasonable explanation for the excess. Edward A. Troncelliti,30 T.C.M. 297, 40 P-H Memo. T.C. par. 71,072 (1971). The use of this method was premised upon respondent's determination that petitioners' books and records did not adequately reflect their income. Respondent's determination is presumptively correct and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners can sustain their burden either by establishing the adequacy of their records, (see David Courtney,28 T.C. 658, 664 (1957)), or by showing that the difference between the total application of funds and the total reported sources of funds is attributable to non-taxable sources such as loans. Edward A. Troncelliti,supra.Petitioners rely solely on the explanation that the increase in expenditures over reported sources of funds came from the non-taxable source of credit obtained at gambling casinos. We hold for petitioners on the basis that they *192 have carried their burden of proof. We conclude initially that petitioners' books and records were inadequate in that they contained no record of any of petitioners' borrowings and repayments. Respondent discovered petitioner's Las Vegas casino borrowings by chance. Petitioner testified that he also borrowed sums from $50 to $10,000 for short periods without interest, security or the execution of a note, from his friends, and that neither he nor his friends kept any records of these transactions. We find petitioner's testimony vague and that of his friends incredible in this regard. In view of the state of petitioners' books and records, respondent was justified in using the source and application of funds method. See John Harper,54 T.C. 1121, 1129 (1970). 1. Sources of Funds.
Respondent's position is based upon the supposition that all credit extended to petitioner by various gambling casinos was lost at the gaming tables, and that therefore all repayment of credit must have come from an unreported source of income. Respondent has no evidence to back up his theory and relies entirely on the presumption of correctness of his determination. *193 Petitioner has the burden of proof and has, by a preponderance of the evidence (see Valetti v. Commissioner,260 F. 2d 185, 187 (3rd Cir. 1958), reversing on other grounds 28 T.C. 692 (1957)) overcome respondent's presumption of correctness. We do not find, as respondent urges, that petitioners and their witnesses are wholly incredible. While petitioner's story is a very unusual one, his explanation, if believed, that he brought home the money he borrowed and paid back his debts with that borrowed money, is a complete answer to respondent's determination. We found petitioner and his wife to be credible witnesses. There is no question that petitioner obtained credit from the various casinos. The only question is whether he lost the borrowed money at the gaming tables, as respondent claims, or whether he converted the chips obtained on credit to cash with which he subsequently repaid the casinos, as he claims. Against respondent's bare assertion that petitioner lost all the borrowed funds gambling, we have petitioner's rather detailed account of the conversion. He has drawn a fairly clear picture of casino credit practices during the years in *194 issue, their inadequacies, and his behavior in relation to them. The credit situation in Las Vegas at the time and petitioner's credit and repayment records with Caesar's Palace were corroborated by the credit manager of Caesar's Palace. That petitioner was a full-time shoe salesman during the years in issue with limited time to pursue a "second career" was confirmed by the former sales manager of the Barclay Shoe Company. Petitioner's activities on the various gambling junkets were attested to by his wife. We found both petitioner and his wife worthy of belief in this regard. Respondent has offered no evidence to rebut petitioner's story. The fact that petitioner was fond of gambling and apparently kept company with people of like inclination is insufficient evidence to overcome his specific testimony as to his behavior on the gambling junkets taken during the years in issue. The evidence does not contradict petitioners' assertions that they maintained a modest life style. After careful scrutiny of the evidence we conclude that petitioners have met their burden of persuasion as to the source of funds. Since such source of funds exceeds their expenditures for each year *195 in issue, we need not go into the parties' various estimates of petitioner's personal and family living expenses. 2.Fraud Upon The Casinos.
The second issue is whether petitioner obtained credit in the form of playing chips and cash at the various casinos by fraud and with no intention to repay such credit, and whether such funds less repayments constitute taxable income to petitioners in the years in issue. [2]
Respondent raised this issue for the first time after trial. Accordingly, respondent has the burden of proof with respect to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. Consequently, respondent must prove *196 by a preponderance of the evidence that petitioner had no intention of repaying the casinos, and this respondent has failed to do. Petitioner testified that he fully intended to repay his obligations to the casinos. His last payment, according to our record here, was $200 paid to the Flamingo Hotel in 1972. Moreover, petitioner has a good business reason to repay his casino debts as soon as he is financially able, namely, to obtain a work permit in Las Vegas. Petitioner is presently a partner in a travel firm and arranges gambling junkets throughout the world, and he cannot accompany a junket to Las Vegas until he has a Las Vegas work permit. Respondent's argument that petitioner repaid $69,400 of his loans by the end of 1969 solely to increase the amount of credit the casinos would lend him, rather than because he intended to repay his loans as he was able, is unsupported by the record. Respondent, on whom the burden of persuasion rests, has failed to carry that burden. 3. Remaining Issues.
Since we have held for petitioners on the primary issues involving omission of gross income, the remaining issues--whether our ruling at trial rejecting petitioner's offer of *197 polygraph evidence in support of his credibility was correct, whether petitioners are liable for additions to tax for negligence, whether petitioners may use income averaging and whether petitioner Evelyn Parker is an innocent spouse--are moot and we need not reach them. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. See United States v. Rochelle,384 F. 2d 748, 751 (5th Cir. 1967), cert. denied 390 U.S. 946 (1968), where the Court stated, citing James v. United States,366 U.S. 213, 219 (1961): "Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a 'wrongful appropriation [and comes] within the broad sweep of 'gross income'.'" Cf. Rozelle v. McSpadden,50 T.C. 478↩ (1968).