LANCE E. BURGO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8532–75.    Filed February 21, 1978.

*Joseph A. Gordon,* for the petitioner.
*Philip A. Kaiser,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies, plus additions to tax under sections 6653(b)[1] and 6654, in petitioner's Federal income tax for 1968 through 1972:

| Year | Deficiency | Sec. 6653(b) | Sec. 6654 |
|------|-----------|--------------|-----------|
| 1968 | $4,835.12 | $2,417.56 | $148.68 |
| 1969 | 3,303.23 | 1,651.62 | 105.70 |
| 1970 | 1,758.95 | 879.48 | 56.29 |
| 1971 | 2,030.00 | 1,015.00 | 64.96 |
| 1972 | 1,337.92 | 668.96 | 42.81 |

The issues for decision are:

(1) Whether "Exhibit X" is admissible in evidence;

(2) Whether petitioner had unreported taxable income during the years in question; specifically—

(a) Did he purchase and maintain a forty-foot yacht, the *Lucky Seven,* with funds obtained from taxable sources;

(b) Did he purchase and maintain a 1961 Rolls Royce with funds obtained from taxable sources;

(c) Did he purchase and maintain a 1967 Cadillac convertible with funds obtained from taxable sources;

(d) Did he pay his legal expenses in 1969 with funds obtained from taxable sources;

(e) Did he purchase clothing in 1968 with funds obtained from taxable sources; and

(f) Did he pay his living expenses during the years in question with funds obtained from taxable sources?

(3) Whether petitioner is liable for additions to tax for fraud; and

(4) Whether petitioner is liable for additions to tax for failure to pay estimated tax.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in question.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

At the time petitioner filed his petition, his legal residence was Malden, Mass. He presently is in the charter boat business in the Virgin Islands. He holds a senior 50-ton offshore license from the Coast Guard which entitles him to take a 50-ton boat anywhere in the world with passengers. He is also a licensed master scuba diver. He has incorporated his charter business and a separate gourmet shop business in St. Thomas, the Virgin Islands. Petitioner obtained his Coast Guard license in 1975. During the years in issue he was studying to get his license.

In 1968 petitioner, who was then 26 years old, was "searching for a path of life," a career. He had a love for the sea and decided he wanted to be a charter boat captain. Apparently his parents were also anxious for him to settle into a career, and were willing to finance his endeavors. Their concern about his then lifestyle is well understood. In March 1967 petitioner stated to the Quincy police, who were interviewing him in connection with the murder of one Maxine Glover, that on the night of the murder he was at the Big M nightclub in Boston "running a prostitute."[2] He further stated that he had previously had two other prostitutes working for him, but that they had been arrested. He apparently had lived with one of the prostitutes, spending considerable time at the Big M, and also had frequented another apartment in Boston he described as a "crash pad." Petitioner had last had legitimate work in 1965 or 1966.

Beginning in 1968 petitioner started the work and study that would eventually lead to his obtaining a charter boat license. Petitioner was helped and encouraged by his parents in this endeavor. Petitioner frequented boat shows, and at such a show in 1968 he discovered a boat that he thought suitable for commencing his career as a charter boat captain, a forty-foot Owens Tahitian Motor Yacht called the *Lucky Seven.* Petitioner described it as the biggest boat for the least money. He persuaded his stepfather to put up enough money to remove the boat from the brokerage listings. For some period of time

---

[2]He had no further involvement in the murder case.

petitioner's stepfather continued to put up additional sums of money on the boat at irregular intervals to encourage petitioner whenever he showed enthusiasm and was working towards a sea career. Eventually an installment purchase contract was executed and the remaining purchase price was financed. When the boat was in the water (not in dry dock), petitioner lived aboard her.

Both petitioner and his parents were initially unaware that petitioner could not perform the duties of a charter boat captain without first obtaining a Coast Guard license. When they discovered he needed a charter boat license, he began to study those subjects on which he would be tested (navigation, map reading, tides, etc.) and he also took training from the Pequosset Power Squadron. In addition, he read about other water-related occupations such as sailing, scuba diving, and underwater photography.

Petitioner and his family did a lot of planning for petitioner's charter boat business. They reserved the corporate name "Atlantic Adventures," printed business cards, and tried to get a Small Business Administration loan. These activities were thwarted by petitioner's lack of a license.

For 3 years the *Lucky Seven* remained in Boston harbor. During this time petitioner and his parents, along with friends and family, took weekend pleasure trips on the boat around the Boston area. In order to have a longer boating season, petitioner sailed the boat to Miami, Fla., in 1971. He lived aboard the boat there during 1971 and 1972. While the boat was in Florida petitioner's parents took vacations on the boat, two or three times a year, cruising through the Bahama Islands. During the same time petitioner continued his studying and also put in "sea time." Five years' "sea time" is required for a charter boat license. It must be done under another's authority and vouched for. To get "sea time" petitioner worked on yachts, fishing boats, tugs, and a salvage vessel without compensation except room and board.

In all this process, petitioner and his parents learned not only that petitioner needed a license to captain a charter boat, but that they had purchased the wrong kind of boat. The *Lucky Seven* ran on gasoline motors which are more expensive to operate than diesel motors. Moreover, generally power boats are used for fishing and sail boats are used for cruising. The *Lucky*

*Seven* did not have the facilities for fishing. Also, petitioner had decided he preferred sailing to power boats. For all these reasons, the *Lucky Seven* was sold in 1973 and the *Sandavore,* a sail boat, was purchased in its place.

Petitioner's parents are Dorothy Burgo Tyler, his mother, and Thomas Tyler, his stepfather. Thomas had known Dorothy since 1962. His platonic relationship with her developed into "a family-type relationship" around 1963 or 1964 at which time he began to help out Dorothy financially. Thomas married Dorothy in 1968 and "moved in permanently" with her, bringing his possessions with him (including an alleged cash hoard). Previously, Thomas lived with his mother who operated a boarding house. Thomas claims he had been accumulating his cash hoard since he was 21 years old, and that he kept the money in his house instead of in a bank because his father had lost money in a bank in the 1929 crash. Dorothy also claimed to have had a small cash hoard of her own. During the years in issue both Dorothy and Thomas were clerks employed fulltime by the United States Post Office. They reported the following taxable income in the years in issue:

| Year | Amount |
|------|--------|
| 1968 | $15,086.12 |
| 1969 | 16,539.63 |
| 1970 | 19,398.48 |
| 1971 | 19,534.12 |
| 1972 | 20,998.60 |

In 1968 and 1969, petitioner's parents spent approximately 57 percent of their gross income on the routine costs of living (except food); these costs included their taxes, mortgage payments, home insurance, interest, utilities, medical expenses, insurance, charitable contributions, pension plan contributions, and other regular monthly expenses.[3] We conclude that a similar

---

[3]Based on petitioner's parents' tax returns for 1968 and 1969, plus their testimony at trial, we find that their expenses for routine costs during these years were as follows:

*1968*

Reported taxable income ................................. $15,086.12

Expenses:      $\dfrac{8,608.07}{15,086.12} = 57.05\%$

| | |
|---|---|
| Federal income tax | $2,200.80 |
| State taxes | 1,481.50 |
| Interest | 584.15 |

percentage of their gross income was used for such expenses in 1970, 1971, and 1972.

In addition to these routine costs, petitioner's parents also incurred various extraordinary expenses during the years in question. In 1968 his parents took a honeymoon vacation in Hawaii, at a cost of approximately $1,000. In 1971 and 1972, after petitioner moved to Florida, his parents visited him (or he would visit them, at their expense) several times, although the exact cost of these visits is unclear. The remainder of petitioner's parents' income went to their living expenses (such as food and entertainment) and petitioner's support.

Petitioner's parents had a very modest standard of living.[4] They both worked in the evening, so they rarely had entertainment expenses. Although their exact cost of living during the

---

Contributions ................................... 447.00
Medical ........................................ 669.89
Telephone ...................................... 300.00
Mortgage ....................................... 1,254.70
Utilities ......................................... 360.00
Pension plan ................................... 1,056.03
Miscellaneous .................................. 114.00
Home insurance ................................ 140.00

|  | 8,608.07 |
|---|---|
|  | 6,478.05 |

*1969*
Reported taxable income ............................... $16,580.06
Expenses:

$$\frac{9{,}498.00}{16{,}580.06} = 57.2\%$$

Federal income tax ........................ $2,479.15
State taxes ................................... 1,452.19
Interest ....................................... 1,215.55
Contributions ................................. 408.00
Medical ....................................... 548.04
Miscellaneous ................................. 132.00
Telephone ..................................... 300.00
Utilities ....................................... 360.00
Home insurance ............................... 170.00
Pension plan .................................. 1,157.77
Mortgage ...................................... 1,275.30

|  | 9,498.00 |
|---|---|
|  | 7,082.06 |

[4]Petitioner's parents' living standard was such that they were able to "accumulate" some of their paychecks. Although their earnings were not great, they could go weeks or months without cashing some of their paychecks. Their bank deposit records show that petitioner's parents did accumulate the checks as they testified.

years in question is not certain, they apparently had approximately $3,000 per year available to spend to support petitioner.[5]

During the years in question petitioner's parents made numerous expenditures on his behalf:

(a) *The "Lucky Seven"*.—In 1968 petitioner made a cash downpayment of $5,347 on the motor yacht *Lucky Seven*. Title to the yacht was taken by his parents, who also obtained financing for the yacht from the New England Merchants National Bank. His parents made the payments on this loan. On January 3, 1973, petitioner's stepfather paid the balance of $1,047.94 owing to New England Merchants National Bank on the loan. On their income tax returns, his parents deducted the sales tax paid in 1968 on the purchase of the yacht and the interest paid to the New England Merchants Bank. Insurance for the yacht also listed his parents as the owners, and they paid these premiums.

In 1968 through 1970 petitioner kept the boat in the Boston Harbor Marina. Dockage charges were $618, $427.92, and $2,381.04 in 1968, 1969, and 1970, respectively. These charges were paid by petitioner's parents, although sometimes petitioner would make the payments with money given to him by them. In 1970 petitioner moved the *Lucky Seven* to the Miamarina in Miami, Fla. There the dockage charges were $2,127.33 and $2,002.52 in 1971 and 1972, respectively. His parents again paid these charges, usually by bank checks (purchased for cash) which were mailed to the Miamarina from Boston. His parents also paid the insurance premiums for coverage of the yacht during all the years in question. When petitioner's stepfather sold the *Lucky Seven* in 1973 for $8,250, he used the money towards the purchase of petitioner's present boat, the *Sandavore*.

(b) *The 1961 Rolls Royce*.—In 1968 petitioner made cash deposits/downpayments totaling $4,000 on a 1961 Rolls Royce (Rolls). From a television show he got the idea of using the Rolls and yacht together as a vacation package. However, the Rolls was never used commercially since petitioner had not obtained his charter-vessel license. He purchased the Rolls from Vintage Auto Sales in Nyack, N. Y., for a total cost of $12,500. When

---

[5]For example, in 1968 his parents had $5,487 left after the cost of necessities (except food) and their vacation. Payments on their Cadillac cost $1,677 and their food bill, according to their testimony, was minimal (perhaps $1,000). Parking at work cost another $100. Accordingly, they had approximately $2,710 available for their son's support in 1968. In later years they would have had greater amounts available, since their earnings increased and they did not take an expensive vacation.

petitioner first discovered the Rolls, his stepfather gave him $1,000 to use as an original deposit to take the Rolls off the market. In December 1968 another payment of $3,000 was made, again in cash. Although petitioner made these payments in 1968, all of these payments were made in cash from moneys belonging to petitioner's stepfather. In 1969 petitioner's stepfather acquired financing for the remainder of the purchase price of the Rolls. A final downpayment of $5,000 was made,[6] and financing for the balance of the purchase price was provided by the Tappan Zee National Bank in New York. His parents paid all the finance charges to the bank, as well as taxes and insurance for the Rolls. On June 24, 1969, petitioner's mother purchased a money order to pay the Tappan Zee National Bank one of the payments due. His parents deducted the sales tax and interest expenses for the Rolls on their 1969 tax return.

The Rolls was kept by petitioner's parents in a closed garage at their home in Malden, even after petitioner moved to Florida. In addition to their hoped-for use of the Rolls in connection with the yacht chartering business, petitioner's stepfather viewed the Rolls as an investment. Petitioner drove the Rolls infrequently; petitioner's stepfather seldom drove the Rolls because he was afraid someone would run into it. In 1971 repairs on the Rolls costing $795 were made; these repairs were paid for by petitioner's stepfather. The Rolls was sold in 1973, the proceeds going to the purchase of the *Sandavore*. Petitioner's stepfather reported a capital gain of several thousand dollars from the sale of the Rolls on his income tax return for that year.

(c) *The 1967 Cadillac Convertible.*—In 1966 petitioner or his mother purchased a new 1966 Cadillac automobile. The following year this automobile was traded-in for a new 1967 Cadillac; this trade-in agreement listed petitioner as the purchaser of the car. In this trade-in a cash payment of $1,556 was made, and the remainder of the purchase price of the 1967 Cadillac was financed by the Cadillac Automobile Co. of Boston. In 1969 the financing was changed to the General Motors Acceptance Corp. Monthly payments on the Cadillac were $129.[7] The documents of

---

[6]Respondent determined downpayments of $5,000 and $4,000 in 1968 and 1969, respectively. In fact, downpayments of only $4,000 were made in 1968. Since the 1969 financing agreement shows total downpayments at that time of $9,000, we must conclude that a downpayment of $5,000 was made in 1969.

[7]Payments made for the automobile were as follows:

sale list petitioner as purchaser, as do the financing agreements and insurance documents. However, the monthly payments on the 1967 Cadillac were paid by petitioner's stepfather. On March 9, 1970, petitioner's stepfather purchased a money order from the New England Merchants National Bank to pay the remaining loan from General Motors Acceptance Corp. Petitioner's mother drove this automobile.

The City of Malden excise tax records list petitioner as the payor of $207.90 excise tax on this automobile in 1968. For 1969, both petitioner and his mother are listed on the excise tax rolls, each one having made a payment for this automobile. However, petitioner's listed payment of $138.60 was abated to $23.10. His mother paid $103.95 excise tax on the car in that year. For both 1968 and 1969 petitioner's parents claimed tax deductions for the excise tax paid. For both years, the taxes were actually paid by petitioner's parents. Similarly, his parents paid the insurance premiums of $123.50 in 1968.

(d) *Legal Expenses.*—In 1969 petitioner incurred legal expenses of $1,400. These legal expenses were paid by his stepfather.

(e) *Clothing.*—In 1968 petitioner purchased clothes for $65 from a men's clothing store in Boston. He received the money to make this purchase from his stepfather.

(f) *Living Expenses.*—In 1968 through 1970 petitioner lived at his parent's home in Malden or on the *Lucky Seven.* His living expenses, including food, clothing, and entertainment, were paid for by his parents. In 1971 he moved to Miami, where he lived aboard the *Lucky Seven.* Again, his living expenses were paid for by his parents. They paid the dockage fees and gave him money for living expenses when they visited him, or they sent him money via one of his friends. While in Florida petitioner had an extremely modest standard of living, since he lived on his boat and often caught fish for his dinner. In addition, when logging "sea time" he was provided his meals.

Petitioner did not file income tax returns for any of the years in question. In the statutory notice, respondent determined that

| Year | Amount | Payee |
|---|---|---|
| 1968 | $1,677 | Cadillac Automobile Co. of Boston |
| 1969 | 1,032 | Cadillac Automobile Co. of Boston |
|  | 516 | General Motors Acceptance Corp. |
| 1970 | 516 | General Motors Acceptance Corp. |

petitioner had purchased and maintained the *Lucky Seven* and the Rolls with unreported taxable income.[8] In addition, respondent determined that financing payments on the 1967 Cadillac, and petitioners' legal expense, clothing, and living expenses were paid by him with unreported taxable income. Respondent also determined additions to tax for fraud and failure to pay estimated tax for all the years in question.

### ULTIMATE FINDINGS OF FACT

Petitioner's parents paid the purchase prices and maintenance costs of the *Lucky Seven*, the 1961 Rolls Royce, and the 1967 Cadillac. They also paid petitioner's living expenses, legal fees, and clothing costs during the years in question.

### OPINION

### 1. *Admissibility of Exhibit X*

The first issue is whether a copy of petitioner's conviction for receiving support from the earnings of a prostitute in 1968 is admissible in evidence. This conviction was entered on June 2,

---

[8]Respondent determined petitioner's unreported taxable income as follows:

|  | 1968 | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|---|
| Boat expenditures | $5,983.48 | $427.92 | $2,380.96 | $2,127.33 | $2,002.52 |
| Automobile expenditures | 6,879.40 | 6,421.10 | 907.63 | 2,778.18 | |
| Cost of living | 3,911.64 | 4,362.41 | 4,362.41 | 4,326.41 | 4,743.03 |
| Legal fees | 1,400.00 | | | | |
| Clothing | 65.00 | | | | |
| Total | 16,839.52 | 12,611.43 | 7,651.00 | 9,231.92 | 6,745.55 |

The evidence in this case establishes the following expenditures made by petitioner's parents for him:

|  | 1968 | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|---|
| Yacht: | | | | | |
| Downpayment | $5,347.00 | | | | |
| Dockage | 618.00 | $427.92 | $2,381.04 | $2,127.33 | $2,002.52 |
| Rolls Royce: | | | | | |
| Downpayment | 4,000.00 | 5,000.00 | | | |
| Repairs | | | | 795.90 | |
| Insurance | | | 196.68 | 196.68 | |
| Excise | | 8.25 | 89.10 | | 85.80 |
| Cadillac: | | | | | |
| Payments | 1,677.00 | 1,548.00 | 516.00 | | |
| Insurance | 123.50 | | | | |
| Excise | 207.90 | 127.05 | | | |
| Legal fees | 1,400.00 | | | | |
| Clothing | 65.00 | | | | |
| Total | 12,038.40 (plus cost of living) | 8,511.22 | 3,182.82 | 3,119.91 | 2,088.32 |

1969, by a judge of the Municipal Court of Boston sitting without a jury. On June 16, 1969, petitioner appealed this conviction to the Superior Court of Suffolk County for trial de novo with jury. On December 5, 1969, the case was dismissed on a motion made by the Commonwealth.

Respondent attempted at trial to introduce into evidence Exhibit X, the record of petitioner's conviction in Municipal Court. Respondent contends that Exhibit X is admissible either as hearsay evidence of petitioner's conviction under rule 803 (22) or to impeach petitioner's testimony under rule 609.

Respondent's first contention is based upon rule 803(22) of the Federal Rules of Evidence, which provides that "evidence of a final judgment" is an exception to the hearsay rule.[9] Unless within an exception to the hearsay rule, the conviction would be inadmissible hearsay since it is an out of court statement (even though written) offered to establish that petitioner received support from a prostitute in 1968. Rules 801, 802, Federal Rules of Evidence. Respondent contends that we should admit this evidence "for what it is worth" in light of the fact that the conviction has been vacated. In support of this contention, respondent relies on the Advisory Committee notes to the House Committee on the Judiciary.[10] Although respondent is correct in asserting that we should admit as evidence a final judgment of conviction, with the Court determining the probative weight of that evidence in the case before it, respondent misses the basic point that for the evidence to be admissible at all it must be a final judgment.

In this case, petitioner's appeal of the conviction vacated the

---

[9]Rule 803 provides in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*     \*     \*     \*     \*     \*     \*

(22) Judgment of previous conviction. Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judment, \* \* \* . The pendency of an appeal may be shown but does not affect admissibility.

[10]The Advisory Committee stated:

"When the status of a former judgment is under consideration in subsequent litigation, three possibilities must be noted: (1) the former judgment is conclusive under the doctrine of res judicata, either as a bar or a collateral estoppel; or (2) it is admissible in evidence for what it is worth; or (3) it may be of no effect at all. \* \* \* The rule adopts the second for judgments of criminal conviction of felony grade."

judgment of the Municipal Court, so that there was no final judgment of a conviction against petitioner.[11] The criminal prosecution against petitioner was then dismissed. Since the judgment of the Municipal Court was vacated and since the Superior Court action was dismissed, petitioner's conviction became a nullity. Accordingly, there is no "final judgment" of a criminal conviction against petitioner which could be admissible under the exception to the hearsay rule provided by rule 803 (22). Respondent's assertion that the Superior Court had to find petitioner innocent in order to render his conviction by the Municipal Court inadmissible is blatantly wrong—a person is innocent until proven guilty. *United States v. Fleischman,* 339 U.S. 349, 363 (1950).

In the alternative, respondent contends that Exhibit X is admissible under rule 609. This rule provides that for purposes of attacking the credibility of a witness, "evidence that he has been convicted" of certain types of crimes (including the offense for which petitioner was convicted in the Municipal Court) is admissible.[12] Rule 609(c) then provides that evidence of a

---

[11]The *Commonwealth of Massachusetts* has a two-tier system of trial courts for criminal cases. The first tier is composed of the district courts in the Commonwealth's counties and the Municipal Court of Boston. These courts have jurisdiction over certain criminal offenses, including the offense for which petitioner was convicted. Mass. Ann. Laws ch. 218, sec. 26 (1974). If the defendant pleads not guilty in the first tier, he is tried by a judge sitting without a jury. The defendant may not waive this trial, since access to the second tier (the Superior Court) is conditioned upon a conviction by the lower court. However, the defendant need make no defense in this trial. (The record does not disclose whether petitioner chose in this case to offer a defense.) Once a person is convicted in the Municipal Court of Boston (as in this case), he may appeal to either the Suffolk County Superior Court or the Twelve-Member Jury Division of the Municipal Court of Boston. Appeal from the judgment of the Municipal Court vacates that judgment. *Enbinder v. Commonwealth,* 330 N.E.2d 846, 849 (Mass. 1975). Cf. *Costarelli v. Massachusetts,* 421 U.S. 193, 194 (1975). The case is then tried de novo in the second tier. Mass. Ann. Laws ch. 218, sec. 23 (1974).

[12]Rule 609. Impeachment by Evidence of Conviction of Crime

(a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

(c) Effect of pardon, annulment, or certificate of rehabilitation. Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, and that person had not been convicted of a subsequent crime which was punishable by death or imprisonment in excess of one year, or (2) the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

\*     \*     \*     \*     \*     \*     \*

(e) Pendency of appeal. The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible.

conviction is not admissible if the conviction has been the subject of a pardon, annulment, or certificate of rehabilitation. Respondent contends that a conviction which has been vacated does not fall within rule 609(c) and is therefore admissible.

Although rule 609 does not explicitly state that evidence of a conviction reversed or vacated by an appeal is not admissible under this rule to impeach a witness, we infer this condition from rule 609(e) and the case law that preceded the Federal Rules. Rule 609(e) provides that the pendency of an appeal does not render evidence of a conviction inadmissible; this provision supports in two ways petitioner's contention that evidence of a conviction which has been reversed or vacated is inadmissible under rule 609. First, rule 609(e) would be superfluous if any conviction, whether or not reversed on appeal, is admissible. A specific provision allowing convictions on appeal to be used as evidence would not be needed if any conviction, whether appealed, reversed, or vacated could be used as impeachment evidence. Second, by inference, a specific provision allowing convictions on appeal to be used as impeachment evidence implies that if the appeal is successful, the evidence is not admissible. This inference is supported by the Advisory Committee notes to rule 609(e), which states:

> The presumption of correctness which ought to attend judicial proceedings supports the position that pendency of an appeal does not preclude use of a conviction for impeachment.

When a conviction has been reversed or vacated, this presumption of correctness is no longer applicable; accordingly, the conviction would not be admissible under rule 609 after a successful appeal.[13]

Cases decided before adoption of the Federal Rules of Evidence further support this conclusion. In *United States v. Allen*, 457 F.2d 1361 (9th Cir. 1972), the Court of Appeals stated: "It is the majority view and the law in this circuit that *until the judgment of the lower court is reversed*, the conviction will stand and the defendant may be questioned regarding that conviction for purposes of impeachment." 457 F.2d at 1363. (Emphasis

---

[13]Respondent's contention that only convictions which have been the subject of a pardon, annulment, or certificate of rehabilitation are inadmissible is unsupported by reason of the history of rule 609. The purpose of rule 609(c) is that rehabilitation negates the character assumptions implicit in a conviction. The Advisory Committee noted this effect, and it concluded that evidence of the conviction should therefore be inadmissible. Rule 609(c) provides only one limited exception to the general provisions of rule 609, not the interpretation of "conviction" which respondent relies on.

supplied.) Accord, *United States v. Owens*, 271 F.2d 425, 426 (2d Cir. 1959; *United States v. Empire Packing Co.*, 174 F.2d 16,20 (7th Cir. 1949), cert. denied 337 U.S. 959 (1949). The clear implication to be drawn from the emphasized phrase is that although evidence of a conviction pending appeal is admissible, if that conviction is reversed or vacated the conviction cannot be used for impeachment purposes.

In addition, we draw support for our conclusion from Massachusetts' interpretation of the word "conviction." Massachusetts' laws of evidence provide that "The conviction of a witness of a crime may be shown to affect his credibility." Mass. Ann. Laws ch. 233, sec. 21 (1974). Massachusetts' courts have often interpreted the word "conviction"; these courts have continuously required that the judgment be final and that sentence be imposed. *Attorney General v. Pelletier*, 134 N.E. 407, 420–421 (Mass. 1922). See *Forcier v. Hopkins*, 110 N.E.2d 126, 127 (Mass. 1953); *City of Boston v. Santosuosso*, 30 N.E.2d 278, 296 (Mass. 1940). In fact, the only exception to this general rule, under which a conviction of the Municipal Court which has been vacated by appeal is inadmissible, is in suits for malicious prosecution, in which suits the original conviction in the Municipal Court can be used as proof of the probable cause for the prosecution. *Della Jacova v. Widett*, 244 N.E.2d 580, 584–585 (Mass. 1969); *Magaletta v. Millard*, 195 N.E.2d 324 (Mass. 1964). We conclude that Massachusetts' courts would also not regard petitioner's vacated Municipal Court conviction as a "conviction" for purposes of section 21 of Massachusetts' Law of Witnesses and Evidence.

We hold that Exhibit X is not admissible for any purpose.

## 2. *Unreported Taxable Income*

Respondent used the expenditures method to determine petitioner's unreported taxable income during the years in question. This method is based on the assumption that the amount by which a taxpayer's expenditures during a taxable period exceed his reported income has taxable origins absent some explanation by the taxpayer. This method of determining unreported taxable income is most effective "against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before." *Taglianetti v. United States*, 398 F.2d 558, 562 (1st Cir. 1968), affd. 394 U.S. 316 (1969).

Respondent contends that petitioner had unreported taxable income during 1968 through 1972 from the earnings of several prostitutes in Boston. The sole basis advanced for this contention is petitioner's admission to Detective O'Donnell of the Quincy, Mass., police department in *1967* that he (petitioner) ran several women as prostitutes in Boston. Respondent determined that petitioner, who filed no income tax returns for the years in question, made certain expenditures with unreported taxable income, including the purchase and maintenance of the yacht *Lucky Seven*, a Rolls Royce, a 1967 Cadillac, and payments for legal, clothing, and living expenses.

Resondent's determination that petitioner made certain expenditures with his unreported taxable income has the presumption of correctness, and petitioner bears the burden of proving this determination wrong. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court of Rules of Practice and Procedure. To meet this burden, petitioner must prove either that someone else made the expenditures or that the funds he used for the expenditures were obtained from nontaxable sources. Cf. *Taglianetti v. United States, supra* at 563.[14] First, petitioner denies that he was running prostitutes during the years in issue. It is difficult to see how he could have been while studying and at sea, particularly when he was in Florida. Secondly, he asserts that he was totally supported by his parents during the years in question. He contends that all of the expenditures were either made by his parents or with their money. In support of his contentions, petitioner asserts that he lived at home or on the *Lucky Seven* during the years in issue while studying to obtain a Coast Guard license as a charter-vessel captain. He has now obtained this license. Petitioner contends that his parents wanted him to be successful in this venture, so they supported him and purchased the various equipment for him, including the *Lucky Seven* and the Rolls Royce. It is to these expenditures that we now direct our attention.

(a) *The "Lucky Seven".*—In 1968 petitioner hoped to start a

---

[14]In *Troncelliti v. Commissioner*, 30 T.C.M. 297, 301, 40 P–H Memo. T.C. par. 71,072 at 318 (1971), the Court noted:

"As explanation the taxpayer may show that the difference between the total application [of] funds and the total reported sources of funds is attributable to such nontaxable items as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period."

charter-vessel business using the yacht named *Lucky Seven*. His goal was to run charter cruises, apparently in the waters surrounding Martha's Vineyard. It was in furtherance of this plan that petitioner purchased the *Lucky Seven* in 1968. He made a downpayment of $5,347; the remainder of the purchase price ($10,000) was financed at the New England Merchants National Bank. He claims that he received the money for the downpayment from his parents. In addition, he asserts that they used their funds for all the payments on the yacht as well as dockage charges during the years in question.

Petitioner did not originally know that he needed a Coast Guard license to conduct ocean charters; to obtain this license takes much study and 5 years "sea time." He did not obtain the license while he owned the *Lucky Seven*, so it was never used for commercial purposes. Eventually the *Lucky Seven* was sold, with the proceeds going towards the purchase of the *Sandavore*, which petitioner now uses as a charter vessel. Petitioner obtained his license in 1975.

Both of petitioner's parents testified that his stepfather was the purchaser of the *Lucky Seven*. In support of their testimony, petitioner showed that title to the vessel was taken by petitioner's parents and that they financed the purchase through the New England Merchants National Bank. Evidence was introduced establishing that at least one of the payments to this bank was made by petitioner's parents, corroborating their story. In addition, insurance for the yacht lists his parents as the owners. When the *Lucky Seven* was eventually sold, petitioner's parents again were listed as the record owners.

Respondent contends on two grounds that petitioner, not his parents, purchased the *Lucky Seven*. First, respondent notes that in the original sales agreement and in the dockage agreements petitioner is listed as the purchaser/owner of the *Lucky Seven*. Petitioner explained these facts through his and his parents' testimony. Petitioner discovered the *Lucky Seven* at a boat sale and he made the downpayment with money obtained from his stepfather, and this is why petitioner was listed as the purchaser. Moreover, as the captain of the vessel petitioner was listed by marinas as its owner. We find these explanations to be satisfactory, especially in light of all the other evidence establishing petitioner's parents as the owners of the *Lucky Seven*.

Respondent's second, and primary, contention is that petitioner's parents did not have available the funds necessary to purchase the *Lucky Seven* (and the Rolls Royce) in 1968. We have found as a fact that in 1968 his parents had approximately $2,710 available for their son's support, which would be insufficient for the $5,347 downpayment made on the *Lucky Seven* in that year.[15] Petitioner's mother and stepfather testified that they each had cash hoards, totaling in excess of $15,000, which both kept at home because of their distrust of banks.[16] Generally, absent independent verification, we are disinclined to believe testimony of the existence of a cash hoard. In this case, however, we need not decide whether petitioners parents in fact had a cash hoard, since the only question before the Court is whether they paid for the *Lucky Seven*, not their source of funds. Their source of funds is relevant only as a factor in weighing their credibility. The fact that petitioner's parents did not have acknowledged income sufficient for these purchases is a factor which we have balanced against other evidence indicating that indeed they did supply the money for the purchase of the *Lucky Seven*.[17] We conclude that petitioner's parents purchased the yacht with their own funds. Accordingly, petitioner has met his burden of proving that he acquired the *Lucky Seven* with funds which were not taxable to him.

In addition to the downpayment for the *Lucky Seven*, respondent also determined that petitioner used his unreported taxable income to pay the dockage fees for the boat. The boat was moored at the Boston Harbor Marina in 1968 through 1970 at the cost of $618, $427.92, and $2,381.04 in 1968, 1969, and 1970, respectively. In 1971 petitioner moved to Miami where he moored the *Lucky Seven* at the Miamarina at the cost of $2,127.33 and $2,002.52 in 1971 and 1972, respectively. Again, petitioner claimed that these fees were paid by his parents.

---

[15]See n. 5 *supra*.

[16]Petitioner's mother claimed she had accumulated approximately $3,000 in the previous 10 years; his stepfather claimed an accumulation of $12,000 to $14,000. Petitioner's stepfather testified that he had been able to save this amount because he had lived with his mother, rent free, while working for 18 years. Petitioner's parents were able to accumulate, rather than cash, their paychecks as they received them. We do not doubt that petitioner's parents had funds in addition to their reported income. We make no finding, and need not find, the source of these additional funds other than to conclude the source was not petitioner.

[17]A possible explanation for petitioner's parents' funds is that they were "laundering" petitioner's unreported taxable income by receiving the funds and then making expenditures in their own names. We have carefully observed their demeanor as witnesses and totally discount this possibility.

In support of his contention, respondent points to the fact that when the *Lucky Seven* was moored in both Boston and Miami the dockage agreements listed her in petitioner's name. Petitioner relies on his parents' testimony that they paid these either in cash or with checks purchased from local banks. In addition, he points to the letter from the dockmaster of the Miamarina which states "that when the vessel LUCKY SEVEN was registered at Miamarina from March 6, 1971 to February 15, 1973, payments were usually received from Thomas Tyler, 95 Elwell Street, Malden, Mass." Attached to this letter were the bank checks sent by Thomas Tyler for dockage charges in January and February of 1973.

We consider this last piece of evidence corroborating petitioner's parents' testimony to be very persuasive. This evidence confirms their story that they paid the dockage charges in Miami, and also adds to the credibility of their story that they paid the dockage charges while the *Lucky Seven* was in Boston as well. On the basis of this evidence and their testimony, we conclude that petitioner has met his burden of proving that his parents, not he, paid the marina charges during the years in question.

(b) *The 1961 Rolls Royce.*—In 1968 petitioner purchased a used 1961 Rolls Royce (Rolls) in New York for $12,500. This purchase required downpayments totaling $4,000 in that year and $5,000 in 1969. The remainder of the purchase price was financed by petitioner's parents at the Tappan Zee National Bank in New York. Respondent contends that petitioner purchased the Rolls and paid its maintenance costs and the payments to the bank with his unreported taxable income. Petitioner again asserts that his parents made all the expenditures related to the Rolls.

Petitioner and his parents claimed that they purchased the Rolls to use along with the *Lucky Seven* in the intended chartering business. Petitioner got the idea of using the Rolls in the business from a television show; his parents agreed with the idea and also viewed the Rolls as a sound investment. The Rolls never was used for commercial purposes; petitioner's stepfather sold it at a substantial gain in 1973.

Petitioner offered several pieces of evidence to prove that his parents, not he, made the payments connected with the Rolls. His parents both testified that they had purchased the Rolls; their testimony is supported by several key facts: first, the

financing agreement lists his parents as the purchasers of the Rolls; second, the New York State original certificate of sale lists petitioner's parents as the owners of the Rolls; third, petitioner's parents financed the purchase, and we have evidence that they paid one of the installments; fourth, his parents deducted the interest paid for financing the Rolls; fifth, petitioner's stepfather testified that he paid tax on the gain of several thousand dollars when he sold the Rolls in 1973. Although we do not have his parents' tax return for that year, this assertion is supported by the fact that petitioner's stepfather received the proceeds of the sale. Finally, after petitioner moved to Miami the Rolls was kept by his parents in Massachusetts; it seems unlikely that petitioner would leave the Rolls there if he were its owner.

However, several other facts indicate that petitioner was the purchaser of the Rolls. Specifically, (a) petitioner is listed as the purchaser of the Rolls on the original purchase contract; (b) insurance agreements list petitioner as the owner of the Rolls; and (c) petitioner is listed as the owner of the Rolls on the City of Malden excise tax records. In addition, respondent again contends that petitioner's parents did not have the funds necessary to purchase the Rolls.

In light of all the facts and judging the credibility of the witnesses, we again find for petitioner. A fact we consider important is that petitioner's stepfather paid tax on the gain from the sale of the Rolls. If petitioner were the true owner of the Rolls and were not reporting his income, it seems logical that he would simply have not reported the gain on the sale of the Rolls as well. In addition, the fact that petitioner's parents assumed liability in order to finance the purchase indicates to us that they were, as they testified, the real owners and purchasers of the Rolls.

Respondent also determined that repairs to the Rolls in 1971 costing $795 were paid for by petitioner with his unreported taxable income. In support of this contention, respondent points to the bill for these repairs which lists petitioner as the owner of the Rolls. Petitioner and his stepfather both testified that his stepfather gave petitioner the money for these repairs. Although petitioner has no evidence of this fact other than this testimony, we found both witnesses to be credible on this point. We also note that in 1971 petitioner was living in Miami but the

Rolls was kept by his parents in Malden; it does not seem inconsistent to us that his stepfather would pay for these repairs.

Accordingly, we find that petitioner's parents, not petitioner, paid the downpayments and installment payments for the purchase of the Rolls, and that they also paid the insurance, excise tax, and repair costs associated with maintaining the car.

(c) *The 1967 Cadillac Convertible.*—Petitioner's mother drove a 1967 Cadillac convertible. This car was obtained in 1967 by trading-in another car; the trade-in agreement listed petitioner as the purchaser of the Cadillac. This new car was financed through the Cadillac Automobile Co. of Boston, with financing subsequently being provided by the General Motors Acceptance Corp. Respondent determined that petitioner paid the excise tax, insurance, and financing payments for this Cadillac during the years in question with his unreported taxable income. Petitioner's parents both testified, however, that the Cadillac was his mother's car and that she made all the payments on this automobile.

The evidence presented on this issue is both sketchy and contradictory. On the one hand, petitioner was listed as the purchaser of the car in 1967, and he paid the excise tax for 1968 (and some of the excise tax for 1969). Similarly, the insurance agreements list petitioner as the owner of the car. Petitioner and his parents explained that petitioner "found" the Cadillac for his mother and that he often took insurance payments to the neighborhood office for her. On the other hand, petitioner's mother and stepfather both testified that the Cadillac was her automobile, and we found them to be credible witnesses on this point. In addition, petitioner's mother paid the excise tax for 1969, and petitioner's stepfather paid one of the installments due to the General Motors Acceptance Corp.

Considering all the evidence on this issue, we hold that petitioner's parents, not he, made the payments due on the Cadillac and also paid the insurance premiums and excise tax due. Our conclusion is based primarily on petitioner's parents' testimony, which we found to be a credible explanation of why some of the bills listed petitioner as the owner of the car. In addition, the fact that petitioner's parents paid the financing debt as they testified and that his mother paid the excise tax (as she testified) bolsters their credibility. Accordingly, we hold that

petitioner has met his burden of proving that he did not make the expenditures for the Cadillac.

(d) *Legal Expenses.*—In 1969 petitioner incurred legal expenses of $1,400. He testified, as did his parents, that these expenses were paid by him with cash given to him by his stepfather. Since we lack any concrete evidence on this issue, our determination must be made solely on the basis of the credibility of the witnesses on this point. We found their testimony—especially that of petitioner's stepfather—to be credible on this issue, and hold that this testimony satisfies petitioner's burden of proving that he paid the legal fees with funds obtained from a nontaxable source.

(e) *Clothing.*—In 1968 petitioner purchased clothing for $65 from a men's clothing store in Boston. Respondent determined that petitioner made this expenditure with his unreported taxable income; petitioner's stepfather testified that he gave petitioner the money for this purchase. We found this explanation—and the witness—to be credible, and hold that petitioner made this purchase with money given to him by his stepfather.

(f) *Living Expenses.*—Respondent determined petitioner's living expenses for the years in question on the basis of the Bureau of Labor Statistics; these Statistics provide, in general, a reasonable basis for such a determination. See *Giddio v. Commissioner.* 54 T.C. 1530, 1532 (1970). Respondent contends that petitioner paid these living expenses with his unreported taxable income; petitioner and his parents testified that he was supported by them during these years.

This issue, like so many others in this case, turns on the credibility of the witnesses. On other issues we have found some extrinsic facts supporting their testimony, which has bolstered their credibility in our eyes. Here we must depend on testimony alone. Petitioner's living expenses were minimal while he was in Miami. He worked on other vessels during these years and while at sea he was provided with room and board. In addition, he obtained a portion of his food from the sea upon which he lived. In light of these facts, petitioner's parents' testimony that supporting petitioner was not an excessive burden seems credible.

We conclude, on the basis of all the testimony and demeanor of the witnesses, that petitioner's parents' testimony that they paid petitioner's living expenses during the years in question is

credible. This credible testimony satisfies petitioner's burden of proving that he did not pay his own living expenses.

We have found, on the basis of the testimony of petiioner and his parents and the facts introduced in evidence, that petitioner's parents made each of the expenditures which respondent determined that petitioner made with his unreported taxable income. Petitioner's burden of proof extends no further— he need not establish that he had no unreported taxable income. Rather, petitioner only has to establish either that someone else made these expenditures or that the funds he used for these expenditures were obtained from nontaxable sources; he has met this burden.[18] Accordingly,

*Decision will be entered for the petitioner.*

---

[18]Since we find that there are no deficiencies for any of the years in question, the additions to tax determined by respondent are inapplicable.