T.C. Memo. 2013-238

UNITED STATES TAX COURT

JUSTICE EDEM AND MARY J. EDEM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13234-06, 11789-08.        Filed October 22, 2013.

<u>Akintunde Samuel Akintimoye</u>, for petitioners.

<u>Ronald S. Chun</u> and <u>Alexander D. Devitis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>: In these consolidated cases respondent issued two notices of

deficiency, one for 2002 and another for 2003 and 2004. Respondent determined

[*2] the following deficiencies, addition to tax, and penalties with respect to the Edems' Federal income tax for years 2002, 2003, and 2004:[1]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|---------------------------------|----------------------|
| 2002 | $691,470 | --- | $138,294 |
| 2003 | 250,954 | $12,397 | 50,191 |
| 2004 | 28,018 | --- | 5,604 |

After respondent issued the notices of deficiency, he made several concessions, including the addition to tax and all of the penalties. The issues remaining for consideration are whether the Edems have unreported income and whether they are entitled to various deductions, principally relating to their healthcare business. Based on the evidence presented at trial, we hold that the Edems had unreported income and that they are entitled to additional deductions that were not initially allowed but were conceded by respondent after trial.

FINDINGS OF FACT

Mr. and Mrs. Edem are married individuals who resided in California at the time the petition was filed.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

**[*3]** Mr. and Mrs. Edem owned interests in two medical supply businesses that also did business with each other. Mr. Edem was the 100% shareholder of Patient's Care Medical Distributors, Inc. (Patient's Care), a subchapter S corporation. During the years at issue Patient's Care sold medical supplies in California until it ceased operation in 2004. Mrs. Edem was a shareholder of Nation's Care Medical Distributors, Inc. (Nation's Care), a subchapter C corporation. Mrs. Edem did not appear at trial, and Mr. Edem testified that he was unsure about how much stock Mrs. Edem owned in Nation's Care. Mr. Edem testified that Patient's Care would buy supplies and equipment from Nation's Care but the two companies had no other relationship. Further, Mr. Edem stated that his wife never worked for Patient's Care and did not represent Patient's Care in any capacity.

The Edems filed Forms 1040, U.S. Individual Income Tax Return, for 2002, 2003, and 2004.

2002 Form 1040

The Edems timely filed their 2002 return to which they attached a Schedule C, Profit or Loss From Business, and a Schedule E, Supplemental Income and Loss. On the Schedule C the Edems reported gross income and claimed various expenses relating to what was characterized as "Services - Ministry", this included

**[\*4]** $500 of gross income that was offset by expenses of $20,773. On the Schedule E the Edems reported only a flowthrough loss from Patient's Care. In contrast, Patient's Care filed a Form 1120S, U.S. Income Tax Return for an S Corporation, which reported ordinary income in the same amount as the loss that the Edems reported on their Schedule E.[2]

2003 Form 1040

The Edems timely filed their 2003 return, but that return did not include a Schedule C or report any business income or loss. Further, they attached a blank Schedule E to their 2003 return but did not report any income or loss from any S corporation. Patient's Care also filed a Form 1120S for 2003 that reported a loss of $89,044.

2004 Form 1040

The Edems filed their 2004 return and again did not attach a Schedule C or E to the return. Patient's Care did not file a Form 1120S for 2004.

Examination

In January 2006 the Internal Revenue Service (IRS) began an audit of the Edems' 2002, 2003, and 2004 returns as well as Patient's Care's Form 1120S

---

[2]This appears to be the result of a missing sign on the Form 1120S to indicate the number should have been negative.

[*5] returns for 2002 and 2003. The revenue agent assigned to the cases sent Mr. Edem two letters to inform him that the returns were being audited. After she did not receive a response, the revenue agent issued a summons. Per the summons, the revenue agent met with Mr. Edem at her office; and although he provided her with Patient's Care's cash journal report for 2002 and 2003 and a document entitled "Patient's Care Income/Expenses" for 2002, he did not provide her with any supporting documents. Mr. Edem also provided the revenue agent with an "amended" 2002 Form 1120S for Patient's Care, which the revenue agent used during the examination.[3] The revised Form 1120S listed a larger loss for Patient's Care than the loss reported on the Form 1120S that had previously been filed with the IRS. Mr. Edem did not provide any documents to support the claimed Schedule C expenses or the disputed expenses of Patient's Care for 2002. The revenue agent stated that she had met with Mrs. Edem on one occasion but could not testify to the specifics of the meeting.

The revenue agent noticed that the amounts on the documents Mr. Edem had provided did not match the amounts reported on the returns. The revenue agent stated that when she asked Mr. Edem about the discrepancies and the

---

[3]The amended Form 1120S provided to the Court was unsigned. However, the revenue agent testified that to the best of her recollection, a Form 1120S conforming with the one provided to the Court was filed as an amended return.

**[*6]** operations of Patient's Care, he was uncooperative and provided her with only vague answers. As a result of this lack of explanation and a lack of documents, the revenue agent conducted a bank deposits analysis of the Edems' personal bank accounts for the years at issue. In addition, the revenue agent conducted a bank deposits analysis for Patient's Care for 2003 and 2004.

The revenue agent gathered information for the bank deposits analysis through summonses. The revenue agent reviewed the records for transfers between the accounts or other nontaxable sources of income and subtracted those amounts so that they would not be counted as income. After comparing the bank deposits analysis, the documents provided, and the tax returns, the revenue agent determined deficiencies for 2002, 2003, and 2004. As part of those deficiencies, the revenue agent found that Mrs. Edem had received dividends from Nation's Care and that those dividends should have been included in the Edems' income for 2003 and 2004.

Respondent issued the notice of deficiency for 2002 on April 7, 2006, and the notice of deficiency for 2003 and 2004 on March 12, 2008. The Edems timely petitioned each notice, and the cases were consolidated.

**[*7]** <u>Tax Court Proceedings</u>

These cases have been continued several times over the past six years. One theme underlying the continuances is the criminal investigation and subsequent incarceration of Mr. Edem. In 2008 Mr. Edem was convicted in the Superior Court of California of multiple counts of insurance fraud and making a false document, as well as one count of grand theft: property over $400, all relating to Patient's Care. As a result of his convictions, Mr. Edem was sentenced to 13 years in State prison.

Respondent's counsel and the Edems' counsel appeared before the Court on June 18, 2012. At that time, the Edems' counsel explained the difficulties that he had experienced in working with his clients. He stated that Mrs. Edem had not responded to his certified mailing attempts and that Mr. Edem had not contacted him since incarceration. As a result of the lack of cooperation, the parties discussed the possibility of filing a motion to dismiss for failure to prosecute or filing a motion for entry of decision with the Court. In addition, respondent expressed his intent to make the following concessions:

| [*8] Year | Concession | Amount |
|---|---|---|
| 2002 | Schedule E unreported income | $541,000 |
| 2002 | Schedule E purchases | 53,311 |
| 2002 | Schedule E other deductions | 142,245 |
| 2002 | Schedule C gross receipts | 86,843 |
| 2002 | Schedule C expenses | 4,155 |
| 2002 | Sec. 6662(a) penalty | 138,294 |
| 2003 | Schedule E returns and allowances | 723 |
| 2003 | Schedule E purchases | 7,215 |
| 2003 | Schedule E other deductions | 20,798 |
| 2003 | Capital gain | 63,301 |
| 2003 | Sec. 6651(a)(1) addition to tax | 12,397 |
| 2003 | Sec. 6662(a) penalty | 50,191 |
| 2004 | Capital gain | 29,036 |
| 2004 | Sec. 6662(a) penalty | 5,604 |

Based on what transpired when the cases were called, the Court asked respondent to recompute the deficiency and ordered the parties to file a status report or a motion for entry of decision within 90 days. After an extension of time, the Edems' counsel informed the Court and respondent that he had been in contact with his clients and that they did not agree with the proposed computations.

**[*9]**   These cases were calendared once again for trial in Los Angeles, California. Further, the Court issued a writ of habeas corpus ad testificandum to enable Mr. Edem to be present at trial.

At trial the Edems' counsel stated that the business records of Patient's Care had been seized as part of the State criminal investigation.  In an attempt to better explain the basis for the amounts reported on the returns, Mr. Edem testified as to how these amounts were determined.  He stated that there was an in-house bookkeeper who worked for Patient's Care and that her records were sent to the accounting company that filed the returns.  In addition, receipts, canceled checks, and bank deposits by the office manager were also sent to the accountant's office to aid in completion of the returns.  The returns were then sent to Mr. Edem to verify, which he would do by looking at the same records.

Although this process for preparing and verifying the returns would be expected to lead to certainty, the testimony at trial made clear that Mr. Edem was unclear as to what amounts of income and deductions were correct.  The Court was presented with conflicting numbers, and Mr. Edem was unable to credibly testify as to which numbers were correct.  For example, Mr. Edem testified that the amount shown for gross receipts in the cash journal was correct but later testified that the amount of gross receipts shown on the tax return was correct; yet they

**[*10]** were different numbers. This same scenario played out repeatedly. And not only was the cash journal inconsistent with the tax return, but neither of those documents was consistent with another version of the tax return that was provided during the course of the examination. The inconsistency in Mr. Edem's testimony, coupled with the inconsistency in the documents, calls into question Mr. Edem's credibility as a witness. The lack of credibility poses a problem for Mr. Edem, because other than his unreliable testimony about deductions taken by Patient's Care, the Court was not provided any evidence to substantiate those deductions.

After Mr. Edem testified respondent called the revenue agent to explain how she made her determinations. The Court questioned the revenue agent about her use of Patient's Care's 2002 cash journal report because it reflected entries only through October 2002. The revenue agent was not sure when she first learned that the journal, largely consisting of deductible expenses, was incomplete.[4] The Edems' counsel questioned the revenue agent about additional bank statements, canceled checks, and accounting records that were received after the examination had ended. The revenue agent stated that most of what was provided she had already obtained through her examination. The revenue agent also acknowledged

---

[4]She reviewed a similar cash journal report for 2003, but that cash journal was not provided to the Court.

**[*11]** that she had inadvertently forgotten to make a separate adjustment to disallow the loss listed on Patient's Care's 2003 Form 1120S.

After the trial the parties filed a joint status report in which respondent made additional concessions after reviewing the 2002 and 2003 Patient's Care cash journals, the latter of which was not introduced into evidence. After recognizing that the 2002 cash journal was missing two months of entries, respondent conceded that Patient's Care should be allowed $319,631 in additional expenses for 2002. Further, after recognizing that the 2003 cash journal was missing three months of entries, respondent conceded $65,465 in additional expenses of Patient's Care for 2003.

We are left to sort out what remains.

## OPINION

### I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving otherwise.[5] The Court of Appeals for the Ninth Circuit, to which an appeal of these cases would lie, has held that in order for the presumption of correctness to attach, the Commissioner

---

[5] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[*12] must provide a proper evidentiary foundation.[6] While the burden could shift to respondent under section 7491(a), the Edems have failed to show that they met the requirements.

Income tax deductions are a "matter of legislative grace", and the burden of proving entitlement to any claimed deduction rests on the taxpayers.[7] Further, taxpayers are required to maintain sufficient records to "show whether or not such person is liable for tax".[8]

Where a taxpayer shows that his inability to produce adequate records is due to circumstances beyond his control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer is allowed to substantiate deductions through other credible evidence.[9] The Edems claim that many of their records were confiscated because of the criminal investigation into Patient's Care. Even assuming, arguendo, that the seizure of records pursuant to the criminal investigation was an event beyond the Edems' control and that they could not obtain access to those

---

[6]Weimerskirch v. Commissioner, 596 F.2d 358, 362 (1979), rev'g 67 T.C. 672 (1977).

[7]Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

[8]See sec. 6001.

[9]Boyd v. Commissioner, 122 T.C. 305, 320 (2004); sec. 1.274-5T(c)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985).

[*13] records, they have failed to provide corroborating records or credible testimony relating to the claimed expenses.

## II. Omitted Income

### A. Bank Deposits Analysis

Where a taxpayer fails to keep sufficient records under section 6001, the Commissioner may compute taxable income through a method that "does clearly reflect income."[10] The Commissioner's use of the bank deposits analysis method has long been approved in such an instance.[11] This method "assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable source or deductible expense of which it has knowledge."[12] Nontaxable sources include funds attributable to "loans, gifts, inheritances, or assets on hand at the beginning of the taxable period."[13]

---

[10]Sec. 446(b).

[11]Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978).

[12]Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994) (citing DiLeo v. Commissioner, 96 T.C. 858, 868 (1991)).

[13]Burgo v. Commissioner, 69 T.C. 729, 743 n.14 (1978) (quoting Troncelliti v. Commissioner, T.C. Memo. 1971-72).

**[\*14]** A bank deposits analysis provides prima facie evidence of income, and the Commissioner is not required to prove the likely source of the income.[14] The taxpayer shoulders the burden of establishing that items "should be excluded from income or allowed as deductions."[15] One such way of proving that an item should have been excluded would be to show that the deposit is derived from a nontaxable source.[16]

### B. Schedule C Gross Receipts

Respondent reconstructed the Edems' gross income for 2002, 2003, and 2004 using the bank deposits analysis. The revenue agent testified at trial that in preparing the analysis, she looked at bank statements and other information provided by the bank. She then subtracted any amounts that appeared to come from nontaxable sources, such as transfers between related accounts or amounts that would be taxable under other categories, such as dividends.

For 2002 the revenue agent testified at trial that the bank deposits analysis reflected an understatement of income of $85,850, whereas the 2002 notice of

---

[14]Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[15]Gemma v. Commissioner, 46 T.C. 821, 833 (1966).

[16]See Nicholas v. Commissioner, 70 T.C. at 1064.

[*15] deficiency listed an adjustment of $172,693.[17]  While respondent explained at trial that it was his position that the $85,850 was the proper amount of the understatement, that amount does not appear to subtract the $500 of income that the Edems reported on their 2002 Schedule C.  The revenue agent listed $85,850 on the workpapers she prepared as part of the bank deposits analysis.  However, there is no indication that the $500 reported by the Edems in 2002 was taken into account.  Therefore, to the extent that the $500 was not taken into account it should be considered as part of the Rule 155 computation.

At trial Mr. Edem testified that he made loans to Patient's Care when the company first started operations and during the life of the company.  Mr. Edem testified that he could not remember the exact amounts of the loans but that the total was between $200,000 and $300,000.  He also stated that Patient's Care paid back some of the loans.  Although Mr. Edem testified that the accounting firm that the company used had documents related to these loans, he did not provide them to the Court.  Because of the lack of documentary evidence and Mr. Edems' inability to testify credibly as to any specifics regarding the loans, we do not find that any amounts should be deducted from the Edems' gross receipts.

---

[17]The understatement of $85,850 represents the difference between the original adjustment of $172,693 and respondent's previous concession of $86,843.

**[*16]** The Edems did not present any additional evidence of amounts that should not have been included in their gross receipts for the years at issue. Accordingly, we sustain respondent's determinations as to this issue.

C. Schedule E Gross Receipts

A Form 1120S is used to report gross receipts and deductions of an S corporation, which are then are reported on the Schedule E attached to the taxpayer's tax return.

1. 2002

Respondent prepared a revised Form 4605-A, Examination Changes-- Partnerships, Fiduciaries, Small Business Corporations, and Domestic International Sales Corporations, after the notice of deficiency was issued. The revised Form 4605-A resulted in a smaller adjustment. We base our findings on the revised Form 4605-A.

The revenue agent compared Patient's Care's return to the 2002 cash journal. In almost all of the categories the amount shown on the return did not match the amount shown on the books. As discovered at trial, this may somewhat be explained by the fact that the 2002 cash journal included only entries through October. The revenue agent then compared these numbers with the results from her audit to calculate an adjustment.

**[\*17]** The revenue agent provided her workpapers to show the results of this comparison. For an unknown reason, the revenue agent did not perform a bank deposits analysis of Patient's Care for 2002, even though she performed such analyses for later years. However, respondent met his burden under Weimerskirch based on the revenue agent's review of Patient's Care's records. Moreover, the Edems did not introduce any evidence at trial regarding Patient's Care's gross receipts for 2002 beyond Mr. Edem's vague testimony about the loans. Therefore, we sustain respondent's determination.

### 2. 2003

The revenue agent conducted a bank deposits analysis for 2003 for both the Edems and Patient's Care. Again the revenue agent explained the process through which she conducted the analysis and provided her summary. The summary shows amounts that were subtracted because they came from a nontaxable source. The Edems did not provide any evidence of amounts that should not have been included in Patient's Care's gross receipts, other than Mr. Edem's testimony with regard to the loans he made to the company. Again, we do not find this testimony, without supporting evidence, to be credible. As a result, we do not find that additional amounts should have been excluded, and we sustain respondent's determination.

**[*18]** D. Qualified Dividends

In constructing the bank deposits analyses for 2003 and 2004, the revenue agent determined that Mrs. Edem had received dividends from Nation's Care. The revenue agent adjusted the Edems' income to include these dividends as income for 2003 and 2004. The Edems did not present any evidence at trial to suggest that these adjustments were incorrect.

Accordingly, we sustain respondent's adjustments to include the dividends in gross income for 2003 and 2004.

III. Deductions

Taxpayers are allowed a deduction for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".[18] Taxpayers are not allowed a deduction for personal, living, or family expenses except where specifically enumerated in the Code.[19] Again, deductions are a "matter of legislative grace",[20] and taxpayers must maintain sufficient records to establish the amounts of claimed deductions.[21] These records must be retained for

---

[18]Sec. 162(a).

[19]Sec. 262(a).

[20]INDOPCO, Inc. v. Commissioner, 503 U.S. at 84.

[21]Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

**[*19]** as long as the contents may become material and must be kept available for inspection.[22]

Certain expenses are subject to strict substantiation rules under section 274(d). Such expenses include those relating to travel, meals and entertainment, gifts, and listed property under section 280F(d)(4). For the years in issue listed property included passenger automobiles, any other property used as a means of transportation, computers, and cellular telephones.[23] To comply with the strict substantiation rules, the taxpayer must substantiate using adequate records or by sufficient evidence corroborating the taxpayer's statement the amount, the time and place the expense was incurred, the business purpose, and the business relationship of the taxpayer to any others benefited by the expense.[24] To substantiate by adequate records, the taxpayer must maintain an account book, log, diary, or similar record and documentary evidence to establish each element of an expenditure.[25]

---

[22]Sec. 1.6001-1(e), Income Tax Regs.

[23]Sec. 280F(d)(4).

[24]Sec. 274(d).

[25]Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

**[\*20]**  In some instances, the Court may approximate the amount if the taxpayer can establish a deductible expense but cannot substantiate the precise amount.[26] However, the taxpayer must provide some basis for the estimate.[27]  In addition, the Court is precluded from making estimates with regard to expenses subject to the strict substantiation requirements under section 274(d).[28]

A.  Schedule C Deductions

For 2002 the Edems claimed Schedule C expense deductions related to Mr. Edem's ministry services.  The Edems stipulated that they have no documents that substantiate the claimed deductions.  Further, Mr. Edem did not present any other evidence at trial that would enable the Court to estimate any deductible expenses. As a result, respondent's disallowance of these expenses, beyond what respondent has already conceded, is sustained.

The Edems did not file a Schedule C for 2003 or 2004.

---

[26]Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

[27]Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

[28]Sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

**[\*21]** B. <u>Schedule E Deductions</u>

    1. <u>2002</u>

The Edems stipulated that they did not have any documents that support the expenses that Patient's Care claimed. Nevertheless, respondent conceded some of the Schedule E deductions and conceded additional deductions after recognizing that the 2002 cash journal listed only entries through October. Based on the Edems' lack of credible evidence, they failed to prove that they are entitled to any further deductions beyond respondent's concessions.

Accordingly, we sustain respondent's determinations, in light of previous concessions, as to the 2002 Schedule E adjustments.

    2. <u>2003</u>

The Edems did not provide any documents relating to Patient's Care's 2003 deductions. Mr. Edem's testimony regarding items was vague at best and was not enough to meet his burden with regard to deductions under section 162, much less the higher requirements necessary for the automobile and truck expenses to which section 274(d) applies. Again, after trial respondent conceded additional amounts based on the 2003 cash journal that was not put into evidence, and the Edems did not prove that they are entitled to any further deductions beyond respondent's concessions.

**[*22]**  Accordingly, in light of previous concessions, we sustain respondent's determinations as to the 2003 Schedule E adjustments.

IV.  Patient's Care's 2003 Loss

At trial the revenue agent testified that she mistakenly did not include a line in the 2003 notice of deficiency disallowing the loss deduction of $89,044 claimed on the Form 1120S, even though the loss was not included on the Edems' 2003 Schedule E.  The revenue agent included a line disallowing the loss for 2002, but for that year the loss was listed on the Edems' Form 1040.[29]  However, we recognize that respondent's determination that Patient's Care produced income in 2003 is directly at odds with any claim that the business produced a loss.[30]  Therefore, because we find that Patient's Care had income in 2003, it necessarily follows that any claimed loss by Patient's Care for that year is disallowed.

V.  Additional Adjustments

Finally, respondent made computational adjustments based on the increased income.  These adjustments are not disputed but will need to be revised in the Rule 155 calculation to take into account the adjustments discussed above.

---

[29]Albeit the loss disallowed on the 2002 notice of deficiency was greater than the loss claimed on the Edems' 2002 return because the revenue agent used the revised Form 1120S provided by Mr. Edem.

[30]See Rule 41(b).

**[*23]** VI.  <u>Conclusion</u>

We find that the Edems have failed to carry their burden to show that respondent's adjustments, beyond the concessions respondent has already made, are incorrect.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.