KENNETH J. MANILOFF, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maniloff v. Commissioner
Docket Nos. 18201-89, 12151-90
United States Tax Court
T.C. Memo 1991-554; 1991 Tax Ct. Memo LEXIS 602; 62 T.C.M. (CCH) 1192; T.C.M. (RIA) 91554; November 5, 1991, Filed *602 Decision will be entered under Rule 155. Steven M. Harris, for the petitioner. Julius Gonzales, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4), and Rules 180, 181 and 183. [1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: By separate notices respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax, Sections
Year
Docket No.
Deficiency
6653(b)(1)
6661
1984
18201-89
$ 42,706.00
$ 21,353.00
$ 10,677.00
1985
12151-90
42,258.74
21,129.37
10,557.43
For each year, respondent also *603 determined additions to tax under section 6653(b)(2) in the amount of 50 percent of the interest payable under section 6001 with respect to the portion of the underpayment for each year attributable to civil fraud. Petitioner filed timely petitions in each case, and the cases were consolidated for trial. Petitioner resided in Miami, Florida, when he filed the petitions. After concessions, the only issues remaining for decision are: (1) Whether respondent erred in determining that petitioner received unreported taxable income from drug sales during 1984 and 1985 in the amounts of $ 65,309 and $ 46,812, respectively; and (2) whether respondent erred in determining that the additions to tax for fraud under section 6653(b) apply to any part of the underpayment of tax for each year. FINDINGS OF FACT Background
Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner received an Associate of Arts degree with a major in marketing from the State University of New York in 1967 and studied marketing at the University of Miami in 1968 and 1969. From 1983 through 1986, he sold *604 real estate to earn his livelihood. During 1984 and 1985, petitioner primarily worked as a real estate salesman for West Miami Gardens, Inc., a business concern which speculated in real estate in Dade County, Florida. In 1985, petitioner also received income from West Lake Estates and Sun Manufacturing Corp. Petitioner earned nearly all his income in 1984 and 1985 by selling parcels of land over the telephone to out-of-state investors at night. Through his marketing methods, petitioner was able to obtain sales contracts with deposits of $ 750 from such investors. He had a reputation of being one of the best "boiler-room" telephone salesmen in the business. Petitioner used drugs and alcohol extensively since the 1970s. During 1984 through 1987, petitioner was not diagnosed or treated for substance dependency, although he was under the care of a personal physician for complaints of anxiety and insomnia. Between October 9 and 29, 1987, petitioner was hospitalized for drug abuse and diagnosed as having a chemical dependency. In 1984 and 1985, petitioner owned approximately 70 percent of West Miami Gardens and was in control of the corporation's land sales. West Miami Gardens *605 owned the land that petitioner sold to customers over the phone. The remaining interest in the corporation belonged to Jeffrey Kramer, an acquaintance of petitioner for more than a decade. Kramer's interest in West Miami Gardens was primarily financial, and he exercised a great degree of financial control over West Miami Gardens through his personal secretary, Judy Robinson, who kept the books for West Miami Gardens throughout 1984 and 1985. During 1984 and 1985, petitioner sold a substantial amount of real estate and received commissions for his services from West Miami Gardens. Petitioner received commissions for these sales by checks issued to him by West Miami Gardens which he personally received from Robinson. Petitioner also personally cashed these checks. He did not use a bank checking account and failed to keep any records of his income and expenses. William Pollans, a certified public accountant and Kramer's personal tax accountant since 1978, prepared tax documents for Sun Manufacturing Corporation, Sun Advertising Corporation, Westlake Estates, Inc., and West Miami Gardens. Pollans was the only individual authorized to prepare a Form 1099 on behalf of West Miami *606 Gardens for taxable years 1984 and 1985. Pollans prepared Forms 1099 on behalf of West Miami Gardens for the 1984 and 1985 taxable years, and respondent received these Forms 1099. The forms reported payments made to petitioner in the amounts of $ 32,605 and $ 50,500 during 1984 and 1985, respectively. Each year Pollans delivered the Forms 1099 to Robinson. She either mailed or personally delivered the Forms 1099 to petitioner in the normal course of business. Pollans first met petitioner in 1979 through a mutual business associate. Pollans prepared petitioner's 1980 and 1981 Federal income tax returns. For the 1980 and 1981 taxable years, petitioner reported taxable income of $ 47,700 and $ 34,726, respectively, and concomitant tax liability of $ 9,776 and $ 11,604, respectively. In 1982, Pollans stopped preparing returns for petitioner because he felt that petitioner lacked the diligence and would not maintain documentation necessary to the proper preparation of a tax return, and he was concerned about his potential exposure as a tax return preparer. Petitioner also had not been satisfied with the amount of tax that he had been paying when Pollans prepared his returns, and *607 he shopped around for a more sympathetic tax return preparer. Petitioner employed Saundra Bonduel who prepared his 1982, 1983, 1984, 1985, and 1987 Federal income tax returns. Bonduel had a bookkeeping and tax return preparation business. She was not a certified public accountant, an enrolled agent, or licensed to practice law in any state. Petitioner was told that Bonduel had a reputation of being an unskillful tax advisor. [2] Petitioner was warned of Bonduel's professional reputation and practices by both Kramer and Pollans prior to 1984. Although petitioner received the Forms 1099 issued to him with respect to 1983, 1984, and 1985, it is not clear whether he turned them over to Bonduel. Petitioner usually turned over all tax documents to her. In any event, sometime prior to the filing of the 1984 and 1985 tax returns, Bonduel prepared "corrected" Form 1099 for petitioner from West Miami Gardens. The "corrected" Form 1099 for 1984 was typewritten and reported compensation of $ 6,005 paid to petitioner. The "corrected" Form 1099 for 1985 was handwritten and reported $ 500 income. *608 The Tax Returns
In 1983, petitioner worked for the Southern Federal Title Corporation and received sales commissions of $ 17,385 for his services. Petitioner received a Form 1099 issued by Southern Federal Title Corporation for this amount. He failed to report this income on his tax return. Moreover, petitioner claimed fabricated Schedule C expenses. Bonduel prepared this return, and petitioner signed it. Due to an expiring statute of limitations, the 1983 tax matter was resolved in January of 1987 when petitioner paid additional tax, additions to the tax for negligence, and interest. Petitioner's tax problems for the 1984 taxable year relate to a substantial omission of income and to false deductions claimed on that return. In 1984, petitioner earned $ 32,605 in commissions from West Miami Gardens, income which was reported to respondent on the Form 1099 prepared by Pollans. On Schedule C of that return, petitioner reported only $ 6,005 of this income. This is the amount shown on the "corrected" Form 1099 prepared by Bonduel. In addition, petitioner claimed expenses of $ 5,733.07. He signed this return dated March 1, 1985. There is considerable confusion over when *609 the 1985 return was filed. In connection with respondent's examination of petitioner's 1984 return in January of 1987, respondent's agent, Cheryl Smith, requested a transcript of petitioner's 1985 return. That transcript showed that no 1985 return had been filed. During a meeting in January, Bonduel, who had a power of attorney from petitioner, told Smith that the 1985 tax return had already been filed, and an unsigned copy of the 1985 return bearing petitioner's name was presented by Bonduel to Smith. On Schedule C of that return petitioner reported income of $ 6,525. This amount reflects the Forms 1099 received from Sun Manufacturing Corporation ($ 1,600), West Lake Estates ($ 4,425), and the "corrected" Form 1099 of West Miami Gardens which Bonduel prepared ($ 500). On that Schedule, petitioner also claimed deductions of $ 3,659.27. [3]
*610 Petitioner's 1986 Federal income tax return was not timely filed. Respondent sent notices to petitioner during 1988 and 1989 requesting him to file a Form 1040 for the 1986 taxable year. Petitioner's 1986 Federal income tax return was filed on June 5, 1989. It was neither prepared by Bonduel nor is it under investigation. Petitioner's 1987 return was prepared by Bonduel and is the subject of a full field audit, which began in January of 1990. Examination of Returns
Petitioner's tax return for 1983 was selected for examination in January of 1986 because it appeared that petitioner had omitted Form 1099 income for that year. In connection with the audit of the 1983 return, petitioner's 1984 return was also selected for examination in October of 1986 as a result of respondent's computer noting a discrepancy between Form 1099 income reported on the returns and income reported to respondent by third parties. In December of 1986, the 1983, 1984, and 1985 returns were assigned to Agent Cheryl Smith. Sometime after December 18, 1986, Bonduel presented to respondent a properly signed and notarized Form 2848, Power of Attorney and Declaration of Representative. In connection *611 with respondent's examination of petitioner's 1984 and 1985 income taxes, Smith again met with petitioner and Bonduel on July 30, 1987. Smith interviewed petitioner, seeking information as to his income sources and amounts for 1984 and 1985. During this meeting, Smith informed petitioner and Bonduel that the 1984 and 1985 returns secured during the audit in January of 1986 omitted substantial amounts of income. Petitioner had no records which would substantiate any of the Schedule C deductions taken on both returns. During the course of the meeting, petitioner claimed that he could not remember any information because he had been on drugs for many years. Also at the July 30, 1987 meeting, petitioner told Smith that he sold drugs to support a $ 2,000-a-week drug habit. The deficiency notices issued for taxable years 1984 and 1985 determined that petitioner had income from drug trafficking in the amounts of $ 65,309 and $ 46,812, respectively. Respondent's determinations were based on petitioner's admissions at that meeting. Respondent's calculations were based on drug expenses of $ 104,000 ($ 2,000 a week X 52 weeks) for each year, less amounts of known income of $ 38,691 and *612 $ 57,188 for 1984 and 1985, respectively. The net amounts of these figures represent the unreported income at issue. In his notices of deficiency for 1984 and 1985, respondent included the income from West Miami Gardens that had not been reported and disallowed the deductions claimed. Respondent also determined that the underpayments of tax for 1984 and 1985 were due to fraud. Trial Concessions
Petitioner concedes that, except for the alleged income from drug sales, respondent's determinations of unreported income and the disallowance of expenses are correct. Petitioner also concedes that the additions to tax under section 6661 are applicable. OPINION Drug Income
Petitioner contends that the portion of each notice of deficiency relating to the determination of unreported drug income was arbitrary and erroneous because it was based solely upon statements he made to respondent's auditor, Smith, in 1987. He concludes, therefore, that respondent's determination was arbitrary and erroneous and moved this Court to shift the burden of proof to respondent, which we treat as a motion to shift the burden of going forward with the evidence to respondent. See Kluger v. Commissioner, 83 T.C. 309, 310 n.1 (1984). *613 The general rule is that the taxpayer has the burden of going forward with sufficient evidence to prove the Commissioner's determination of a deficiency to be wrong. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933). While courts have recognized a limited exception to this rule of procedure where respondent alleges that the taxpayer has unreported illegal income (e.g., Jackson v. Commissioner, 73 T.C. 394, 401 (1979)), we need not decide in this case whether the burden of going forward should be shifted. Even if the burden remained on petitioner, he carried that burden. Using the cash expenditures method of income reconstruction ( United States v. Johnson, 319 U.S. 503, 517, 87 L. Ed. 1546, 63 S. Ct. 1233 (1943)), respondent determined that in 1984 and 1985 petitioner expended $ 104,000 for personal use drugs and that petitioner's source of funds for these expenditures was drug trafficking income. The cash expenditures method is based on the assumption that the amount by which a taxpayer's expenditures during a taxable year exceeds his reported income has taxable origins, absent some explanation by the taxpayer. Burgo v. Commissioner, 69 T.C. 729, 742 (1978). *614 A deficiency determined by use of the cash expenditures method is presumptively correct, and the burden of proof is generally upon the taxpayer to demonstrate otherwise. DeVenney v. Commissioner, 85 T.C. 927, 930-931 (1985). At trial, petitioner categorically denied that he had a $ 2,000-a-week drug habit in 1984 and 1985. Petitioner testified that his drug expenditures during those years ranged from zero to $ 500 a week. He further testified that he financed these drug expenditures, and all others, through his real estate income, withdrawals from savings accounts, and income from the sale of personal items. We note that uncontradicted testimony of a particular fact is ordinarily accepted, unless the testimony is inherently questionable, improbable, or unreasonable. Schad v. Commissioner, 87 T.C. 609, 620 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987). In this regard, and perhaps for the only time during the trial, petitioner's testimony was credible and we accept it with respect to the amount of his drug expenses. While we do not doubt that petitioner made these statements to the agent, we believe *615 that it is more likely that he was attempting to set the stage for a defense in the event of a criminal prosecution. Further, respondent did not introduce any evidence of expenditures, other than petitioner's admissions, that would provide a foundation to rebut petitioner's testimony. Respondent's primary witness, Smith, admitted that she did not pursue the issue of unreported drug income during the audit. She also testified that she could not recall specifically the relevant time frame to which petitioner referred when he made statements concerning his drug use. She was not sure whether petitioner was referring to 1984 and 1985, or to 1987 when he indicated that he had a $ 2,000 per week drug habit. Smith never investigated whether petitioner had a savings account, cash on hand as of January 1, 1984, or January 1, 1985, obtained loans, or received any gifts. Moreover, while some witnesses testified that they were aware of petitioner's drug use, no witness testified that he was aware or even heard that petitioner sold drugs. The available evidence suggests that petitioner's drug expenditures (zero to $ 500 weekly X 52 weeks, or a maximum of $ 26,000 yearly) could have been financed *616 with his taxable income, particularly since at the time he paid no taxes on that income. We conclude that petitioner's drug expenses were paid out of his taxable income, as stipulated, during the years in question. Fraud
Respondent determined that petitioner is liable for additions to tax under section 6653(b) for fraudulently understating his income in 1984 and 1985. We agree. Fraud is a voluntary violation of a known legal duty and includes intentional wrongdoing designed to evade tax believed to be owing. See United States v. Pomponio, 429 U.S. 10, 12, 50 L. Ed. 2d 12, 97 S. Ct. 22 (1976); Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941). Respondent has the burden of proving fraud, and he must establish fraud for each taxable year involved by clear and convincing evidence. Rule 142(b); Miller v. Commissioner, 51 T.C. 915 (1969); section 7454(a). To establish fraud, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo 1966-81. *617 The intent required for the imposition of the fraud addition encompasses a specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Respondent may meet his burden of proof with circumstantial evidence and reasonable inferences, since direct evidence of fraudulent intent is seldom available. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). The intent to conceal or mislead may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). But fraud cannot be inferred from a mere understatement of income, Holland v. United States, 348 U.S. 121, 139, 99 L. Ed. 150, 75 S. Ct. 127 (1954), or from a deficiency in taxes due to an honest mistake, Iley v. Commissioner, 19 T.C. 631, 636 (1952). A pattern of consistent understatement of income, however, is an indicium of fraud, as is falsifying tax documents, failing to produce records, and misleading conduct during the investigation of the *618 case. Failure to keep proper records is also an indicium of fraud. See Holland v. Commissioner, supra; Spies v. Commissioner, supra; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). For both 1984 and 1985, all of the previously mentioned indicia of fraud are present, namely, substantial and recurring understatements of income, falsifying tax documents, and failure to keep records. Although no one factor, standing alone, may necessarily carry the burden placed upon respondent, each case is to be considered in light of its own facts. Webb v. Commissioner, supra; Reaves v. Commissioner, 295 F.2d 336 (5th Cir. 1961), affg. 31 T.C. 690 (1958). Resolution of the fraud issue also depends largely upon credibility determinations. Lessmann v. Commissioner, 327 F.2d 990, 994 (8th Cir. 1964), affg. T.C. Memo 1962-253. Although petitioner disclaimed any fraudulent intent at trial, the Court is not compelled to accept such statements at face value. Petitioner concedes that he failed to report substantial amounts of income in 1983, 1984 and 1985 and offers *619 two explanations for this fact. First, he claims that Bonduel, his return preparer, falsified the "corrected" Forms 1099 and filed the 1985 Form 1040 without his knowledge. Second, and somewhat interrelated, petitioner claims that he abused drugs to the point where he lacked the "intentional" element of fraud. Petitioner's first explanation borders on the absurd. Falsifying the Forms 1099 entailed a sophisticated scheme for fraudulently evading the payment of taxes, and petitioner clearly participated in the fraud. It may be that Bonduel devised the scheme. But it is totally unbelievable that Bonduel on her own initiative would have implemented this sophisticated scheme to evade the tax on behalf of petitioner without his knowledge and consent. [4] By seeking out Bonduel's tax return preparation services, petitioner knowingly set in motion the chain of events leading to the filing of tax returns that he had to know were fraudulent. Petitioner acknowledges that he was dissatisfied with Pollans and his tax burden. He, therefore, switched to a tax return preparer he knew was willing to assist him in fraudulently avoiding the payment of his taxes. Petitioner clearly collaborated *620 with his tax return preparer to further his goal of tax evasion. Petitioner also argues that because of his drug use during the years at issue, he was mentally incapable of having fraudulent intent to evade payment of taxes for such years. At trial, petitioner testified at length to his extensive history and experience with drug use. He argues that such sustained use caused him to be careless and inattentive to personal matters, including his income taxes, and prevented him from realizing that his tax returns for 1984 and 1985 omitted large amounts of income. Further, he argues that such drug use caused him to negligently select and supervise his tax return preparer.
The picture of petitioner painted by the evidence, and indeed by his own testimony, is a far different picture from the totally confused drug addict that he now contends that he was. Petitioner clearly was not inept in operating his business *621 during these years. He solicited sales of swamp land in Florida over the phone and persuaded complete strangers to mail to him a $ 750 deposit. He had to be quite persuasive to get people from out-of-state to make these purchases of land, sight unseen. Compare Farber v. Commissioner, 43 T.C. 407, 422-426, Supplemental Opinion 44 T.C. 408 (1965). Furthermore, petitioner played golf almost every day and appears to have socialized "normally" to the extent that some of his associates were unaware that he had a drug problem. Moreover, he must have been aware that he earned more income that he reported. Indeed, the income that he reported was insufficient to cover the expenses of his admitted drug habit to say nothing of his golfing, social, and other living expenses. In sum, after consideration of petitioner's mental state for 1984 and 1985, we conclude that petitioner was capable of forming the intent necessary to predicate an act of fraud. We find that his drug use did not cause him to lose touch with reality or to become mentally incompetent during the years in question. See Yocum v. Commissioner, T.C. Memo 1985-447; *622 Estate of Craddock v. Commissioner, T.C. Memo 1968-164. The evidence in this case is inconsistent with petitioner's theory of diminished capacity and clearly establishes that his underpayment of tax for the years at issue was intentional and not the result of an inadvertent omission related to his drug habit. Compare Hollman v. Commissioner, 38 T.C. 251 (1962), where the Court refused to find fraud when psychiatric evidence presented at trial established that the taxpayer suffered from a severe psychosis rather than a neurosis or milder emotional disturbance. Petitioner objected to evidence offered by respondent, in support of the additions to tax for fraud, relating to events occurring after 1984 and 1985 on the ground that such evidence was irrelevant and immaterial. However, we need not decide that issue because there is ample evidence of fraud for the years in issue. Petitioner also objects to characterization of both the unsigned 1985 Form 1040 and the later filed document ratifying that Form 1040 as a completed return. He contends that respondent erred when he processed petitioner's unsigned Form 1040 and subsequent declaration of *623 ratification as a completed return. On grounds that petitioner failed to file a return for 1985, petitioner postulates that he cannot be held liable for the fraud addition. It is his view that additions to tax for failure to file or for negligence, which were not determined by respondent, would be more appropriate. The imposition of the civil fraud addition prescribed by section 6653(b), however, depends upon a determination of the ultimate fact that petitioner's underpayment of tax for the years 1984 and 1985 was due to fraud. Amos v. Commissioner, 43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). The fact remains that, even if we were to find that he did not file the 1985 return, there was an underpayment that was the direct result of fraud knowingly perpetrated by petitioner. Since we conclude as an ultimate fact that petitioner's underpayment of tax for both years was due to fraud, he is subject to the fraud addition, without deliberation of the status of the Form 1040 filed for the 1985 taxable year. [5]
*624 To reflect our conclusions on the disputed issues and the concessions made by the parties, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to Tax Court Rules of Practice and Procedure.↩
2. In the course of an investigation into a number of land sales schemes by the Florida Bureau of Land Sales, Bonduel's name had featured prominently, and at one point she had been deposed in connection with the investigation. It appears that Bonduel, although not an attorney, typically advised her clients to refuse to answer questions and to plead the Fifth Amendment↩ when investigated and deposed in connection with their land sales operations.
3. During 1987 and 1988, respondent mailed notices to petitioner, requesting him to file a Form 1040 for the 1985 taxable year. On or about July 21, 1988, respondent received an unsigned 1985 Federal income tax return bearing petitioner's name in the Chamblee, Georgia, office. This Form 1040 appears to be identical in every respect to the Form 1040 that was secured by the audit agent in January of 1987. Petitioner later ratified this unsigned Form 1040 through a written Declaration which was received by the Atlanta Service Center on October 13, 1988.↩
4. While Bonduel denied that she prepared the "corrected" Forms 1099, we did not find her testimony credible.↩
5. At the end of the trial, petitioner introduced another unsigned Form 1040 for 1985 bearing his name that allegedly came from Bonduel's files and appears that Bonduel prepared. Petitioner's counsel took great delight in referring to this document as a SCUD missile. But, like so many SCUD attacks, this document fails to hit the mark. First, we have no idea when this document was prepared. Second, while the document reports the omitted income, it also claims a $ 2,000 deduction for an IRA contribution, claims business expense deductions and claims an $ 18,930 credit for estimated tax payments, none of which had any basis in fact. In short, that purported return is every bit as fraudulent as the document given to the Internal Revenue Service. The only inference we can draw from this document is that, if it was prepared in 1986, Bonduel prepared a smorgasbord of fraudulent delights from which petitioner could select. The fact that he chose another, or perhaps did not file a return at all, does not alter our conclusion that petitioner fraudulently attempted to evade the payment of taxes.↩